The STATE of Missouri ex rel. CHURCH-ILL TRUCK LINES, INC., and Bethany Express, Inc., Appellants,

v.

The PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent,

McCarty Truck Lines, Inc., Intervenor-Respondent.

No. KCD 28229.

Missouri Court of Appeals, Kansas City District.

Aug. 8, 1977.

**330**

of Bethany (and all points within a radius of 25 miles thereof) and Princeton (and all points within a radius of 20 miles thereof). Certain truck lines whose existing authority overlapped that sought by McCarty in the present application intervened in opposition before the Commission. Following a hearing, the Commission granted the application with minor variations.[1] Two of the intervenors, Churchill Truck Lines, Inc. and Bethany Express, Inc., sought judicial review of the Commission's order, which was affirmed by the circuit court. From that decision, Churchill and Bethany Express take the present appeal.

Appellants assign four Points Relied On. The first of these constitutes purely an abstract statement of law and presents nothing for review. Rule 84.04(d); *Bonds v. City of Webster Groves*, 432 S.W.2d 777, 783 (Mo.App.1968). The other points relate to (1) the sufficiency of the evidence, and (2) the effect of the Commission's failure to hold an open meeting for the purpose of voting upon the McCarty application. We affirm.

## I.

### SUFFICIENCY OF THE EVIDENCE

Appellants' position concerning the alleged insufficiency of the evidence divides into a number of sub-arguments to the effect that the record: (a) fails to show a need for additional service in the area or that the existing carriers are not providing adequate service; (b) fails to warrant the broad territorial scope of authority granted; and (c) fails to justify the Commission's "ignoring" intervenors' evidence of the adverse effect which approval of the McCarty application would have upon them. In reviewing these challenges, the evidence must be measured by the well established rules that the findings of the Commission will not be disturbed if they are supported by substantial evidence and that once the au-

Warren H. Sapp, Kansas City, for appellants.

Leonard B. Rose, Kansas City, for intervenor-respondent McCarty Truck Lines, Inc.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

McCarty Truck Lines, Inc. applied to the Missouri Public Service Commission for a certificate of public convenience and necessity to conduct operations as a motor vehicle common carrier of general commodities between Kansas City, St. Louis and St. Joseph and their respective commercial zones, on the one hand, and on the other the cities

---

1. The order deleted authority with respect to the commercial zone of St. Joseph, as to which the Report and Order found that no need had been demonstrated. The Commission further concluded that the authority granted should not be described in terms of radii, and instead the authority granted was described in terms of specific points to be served.

thority has been granted by the Commission, the protestants must assume the burden of proof of showing that the Commission's findings are not so supported. *State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216, 217 (Mo.App.1973).

### A. *The Need for Additional Service*

■ The evidence brought forward by the applicant McCarty consisted of the testimony of 38 witnesses representing 14 cities and towns located in the area which the applicant proposed to serve. McCarty conceded that the testimony of four of those witnesses had no probative value and that testimony was so treated in the Commission's extensive findings of fact. The testimony of the 34 other witnesses is summarized by the Commission in its Report and Order which exceeds 25 pages in length and amply reveals the poor service received by area residents from truck lines then currently serving the area and the superior service rendered by McCarty to businesses and individuals in the area which it was already serving.

At the time of the hearing the area now in question was served largely by three truck lines for the transportation of general commodities in bulk. With respect to those three, the Commission found that the testimony established the following:

"Both Bethany Express and Circle M are financially weak. It is apparently their position that this weakness is due to a decline in the freight being shipped into and out of the area in question. However, this record indicates a decline in the business of these carriers resulting from poor service rather than a mere decline in the total freight shipped into the area in question. Although the management of both these carriers has changed hands recently, there has been no marked improvement in the quality of service provided to this area. In the case of Circle M it is not likely that any will occur. In the case of Bethany Express some slight improvement is evident but the company is far from providing the kind of service that the shipping public is entitled to expect.

Churchill Truck Lines, Inc. has been operating in a portion of the area in question for many years. While Churchill's services are not wholly inadequate in those areas where it serves, it has a poor record of claim payment and delivery time which makes its service less adequate than the shipping public should be required to accept."

These findings are well supported by the evidence. Numerous witnesses testified that their experience as receivers of freight carried by Bethany Express and Circle M has been characterized by: (1) slow service which causes harmful delay when receiving sometimes urgently needed merchandise; (2) rough or careless handling which results in damaged merchandise; (3) inattention, delay or outright refusal to pay claims; (4) the necessity of prepayment of part of the freight charges in instances where another truck line had interlined with Bethany Express—which resulted from Bethany's weak financial condition and past failure to pay such charges; and (5) delay or failure to pick up merchandise which had been delivered but which for some reason had to be returned.

The interlining prepayment problem was illustrated by one individual who testified that he spent $100 per week in long distance calls trying to locate freight and arrange prepayment so that merchandise could be released to Bethany Express for the final leg of the haul. Another delay instance was related by Mr. McComas of McComas Motor Company in Albany, Missouri, who testified that six months prior to the hearing, Circle M (or Hall & Wells, as it was known under previous ownership) solicited business, but failed to pick up the shipment; McComas called his supplier three days after the goods were due and discovered that the shipment was still sitting on the dock in Lenexa. Another witness testified that there were times, using either Bethany or Circle M, when three out of four shipments a week were late. Max Tunks, the owner of Circle M, himself admitted that some of his freight bills revealed that delivery required 5 to 7 days.

Several witnesses gave graphic descriptions of damaged freight, one of whom testified that one and one-half months before the Commission hearing he had ordered cartons of envelopes from a company which he knew had a covered dock. When the envelopes arrived at his place of business, they had been soaked by water or left out in the rain and he found himself left with 15,000 envelopes with the flaps stuck shut. Another witness testified on behalf of Gentry City Memorial Hospital that in the course of shipment via Circle M and Bethany Express in the 17 months prior to the hearing, chemicals were frozen in shipment on five or six occasions which rendered them useless.

Appellants argue in their brief that "both Bethany Express and Circle M had, at the time of the hearing, worked their way out of financial crises through improved efficiencies by new managements." Insofar as Circle M is concerned, that statement is wholly incorrect. Tunks, the Circle M owner, admitted that his principal occupation was operating a lumberyard, that he only spends an hour to an hour and a half a day in connection with the operation of the truck line; that a lot of changes would have to be made before the truck line could make him a living and that "it's not paying me."

Nor, contrary to appellants' contention, does the performance of Bethany Express appear to be improving significantly. Carl J. Coleman, who at the time of the hearing was the current manager of Bethany Express, admitted under cross-examination that although some improvement had been made, the company still "could be better than they are right now." Furthermore, certain records introduced by Bethany Express itself confirm the claims of slow service made by the various witnesses. The inadequacy of service is explained at least in part by the fact that Bethany has no terminal or dock facilities in either Kansas City or St. Joseph.

The complaints about the service rendered by Churchill, a larger and more stable truck line, were less numerous, but forceful nevertheless. In all, eleven witnesses registered dissatisfaction with the service provided for them by Churchill, mentioning some problems as delayed or slow service, short hours or absence of Saturday service, failure to keep track of merchandise during the various stages of shipment, delay in picking up merchandise, especially that which had to be returned, poor delivery practices, inefficient claims payments and inconvenience in the delivery and unloading process due to the fact that ungainly over-the-road vehicles are used rather than transferring freight to smaller trucks for delivery.

Appellants emphasize certain exhibits offered into evidence by Churchill which trace the dates on which freight was received and delivered—thus showing time in transit—made up from Churchill's business records from January through May of 1973. This evidence was offered in rebuttal to complaints concerning inefficiency of Churchill's service, testified to by witnesses supporting the McCarty application. Reliance upon these exhibits overlooks the fact that the records do not pertain to the same time period about which the McCarty witnesses testified. The hearing opened on February 5 and continued to February 9, 1973, when applicant presented its case, and was convened again June 11, 1973, when appellants presented their evidence consisting primarily of the testimony of the owners of Churchill and Circle M and the manager of Bethany Express. Appellants presented only those records for the month immediately preceding the opening of the hearing and for the four months immediately following. Thus, this five month period represented by appellant's exhibits does not at all coincide with the antecedent period as to which the McCarty witnesses had testified. Furthermore, the records which were offered to support the claim that Churchill rendered substantially overnight service are misleading inasmuch as the use of an average figure camouflages the substantial percentage of runs which took more than overnight for delivery. The exhibits in question, even taken at full face value, do not overwhelm the evidence offered by McCarty and which was relied upon by the Commission.

Appellants suggest that any service deficiencies of the existing service carriers are attributable to an excess of transportation capacity in an area of scanty demand. The Commission arrived at a different conclusion: ". . . [T]his record indicates a decline in the business of these carriers resulting from poor service rather than a mere decline in the total freight shipped into the area in question." That conclusion is amply supported by the testimony of a number of witnesses who stated that they had resorted to hauling their merchandise themselves rather than relying upon the existing truck service which they found inadequate to their needs. These witnesses testified that such an arrangement is inefficient, inconvenient and generally undesirable and that they would utilize the services of a competent and efficient truck line if such were available. Other businesses in the area have decided to break shipments into smaller packages and ship them on successive days in order to meet the requirements of the small parcel carriers such as United Parcel Service, even though that resulted in higher transportation costs. These merchants also indicated that they would have merchandise shipped directly by McCarty in larger shipments if this authority were granted.

Appellants argue that McCarty failed to illustrate that it could improve on either the quality or quantity of service which they provide. The Commission found otherwise: "The Applicant has demonstrated that it does provide overnight service where it presently serves and that it handles customer claims quickly and with a highly cooperative attitude. Applicant proposes to offer this same service in the area which is the subject of this application." That conclusion by the Commission is supported by the testimony of a number of witnesses who had previously had occasion to use McCarty (by requiring freight from different areas which would be covered by different route authority) and also one or more of the intervenors who testified to their dissatisfaction with Churchill, Bethany Express or Circle M and their approval and appreciation of McCarty's service.

Appellants turn their attack next upon the competency of the evidence which was offered in support of the application. They start that attack with the observation that "not one witness appeared from Kansas City, St. Louis or St. Joseph complaining of any inadequacy of service." This phenomenon is completely explained by the fact that the question at issue is the need for service to a particular section of northwest and north central Missouri and the extent to which that need was already being satisfied. The best evidence on this inquiry obviously would be that of users of transportation in the area affected. Moreover, the territory in question involves small towns which require transportation largely for the purpose of bringing goods into the area and the residents are consignees of freight rather than shippers. The consignees are the ones who would have the direct knowledge and best ability to testify as to length of time taken for delivery, the physical condition of shipments on delivery, the manner in which complaints were handled, and the other like matters which were the main subjects for evidence.

Somewhat similarly, appellants go on to allege that 13 witnesses relied upon by the applicant were incompetent to testify because it is not they, but rather their consignors, who select the carrier to transport into the area. This argument overlooks the specific testimony of 8 of the 13 witnesses named to the effect that they can specify the carrier. Furthermore, such a state of affairs, even if true, would not affect the accuracy or relevancy of their testimony with regard to the type of service that the triad of existing carriers have been providing.

The second argument relating to competency of the witnesses focuses upon four witnesses who did not know the origin of the shipment they receive, that is, they did not know whether it moves as intrastate or interstate commerce. It is true that the hearing by the Missouri Public Service Commission was concerned with intrastate shipments as opposed to interstate shipments because the Commission jurisdiction

extends only to the former. Pains were taken during the hearing to restrict questioning to intrastate shipments. Only to a limited extent, and that only when a witness could not testify as to whether shipments were purely intrastate, did the presiding officer rule that even evidence as to interstate service was relevant to show the quality of service being rendered over the routes in question. These rulings were not error. The Commission was properly concerned not only with the quantity of service needed in the area, but also with the quality of service being rendered.

The appellants also put forward a number of more narrowly defined arguments attempting to refute the testimony of various witnesses, attacking their credibility, or otherwise attempting to discredit their testimony. Such attacks are not persuasive or significant in light of the quantity and quality of evidence put forth by the applicant and accepted by the Commission.

B. *Scope of the Territorial Authority.*

■ Appellants advance the argument that of the more than 50 towns involved in the application, only 13 were represented by witnesses at the hearing. The applicants need not produce witnesses from every town and hamlet in order to show a need in a given area; a showing of need in some towns can support a grant of wider authority in the general vicinity. *State ex rel. National Trailer Convoy, Inc. v. Public Service Commission,* 488 S.W.2d 942, 945 (Mo. App.1972); *State ex rel. Byers Transp. Co., Inc. v. Public Service Commission,* 246 S.W.2d 825, 827 (Mo.App.1952); *State ex rel. Pitcairn v. Public Service Commission,* 232 Mo.App. 755, 111 S.W.2d 982, 987 (1937). See also *State ex rel. St. Louis-San Francisco Railway Co. v. Public Service Commission,* 439 S.W.2d 556, 560 (Mo.App.1969).

■ The authority sought by McCarty was to serve an area covered by a 25 mile radius from Bethany and a 20 mile radius from Princeton. The witnesses who testified represented Bethany, Princeton, and various towns in both radial areas. The Commission could reasonably conclude that the service deficiencies shown to be present in 14 towns in these two areas would exist also throughout the contiguous areas. Furthermore, the Commission was cognizant of the limits of inference; for it refused to extend the grant of authority sought by McCarty to the St. Joseph commercial zone on the grounds that "no need has been demonstrated." In short, the proof adduced fairly supports the Public Service Commission in its grant of authority from Kansas City and St. Louis and their commercial zones and from St. Joseph to the town specified in these two areas.

C. *Adverse Effects upon Competitors.*

For their final subpoint regarding the sufficiency of the evidence, appellants insist that the Commission should have treated as having controlling importance the adverse effect which the grant of the McCarty application will have upon existing carriers in the territory. Appellants point out correctly that Section 390.051–6 [2] commands that "[i]n determining whether a certificate should be issued the commission shall give reasonable consideration to the transportation service being furnished by any common carrier by rail or motor vehicle and the effect which the proposed transportation service may have upon such carriers * *." It must be noted, however that the very same section goes on with a further provision immediately following, which states that: "the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing."

■ The foregoing statutory language as well as the decisional law on the subject dictate that the Commission shall weigh and balance the need, if any, for additional service against the loss of business and consequent adverse effect which will be caused to existing carriers by the grant of an addi-

---

2. All statutory references are to RSMo 1969 unless otherwise noted.

tional certificate to a new carrier. This balancing process has been performed by the Commission in this case as evidenced by its Report and Order in which it considered the capabilities, equipment, facilities and route authority granted to Churchill, Bethany Express and Circle M, the inadequacy of the service currently being provided by those three carriers and the financial weakness of Bethany Express and Circle M; and on the basis of the whole record the Commission concluded that "[t]here is a need for the proposed service * * * [t]he regulation of motor common carriers is the regulation of competition not the regulation of monopoly and the proposed service is needed to provide adequate and reasonably competitive service."

The record here does contain evidence which indicates some potential adverse effect will be caused to the three existing carriers. However there is also other evidence which indicates that the impact may be minimal. For example, McCarty testified that he did not expect his company to divert much traffic from the existing carriers because he anticipated drawing much of his business from individuals and businesses who are currently either hauling their own freight or using an alternative such as one of the "pony express" carriers. As already adverted to above in this opinion, there was considerable evidence that a number of businesses and individuals are hauling their own freight or using pony express carriage because of deficiencies in services heretofore offered and that these businesses and individuals preferred and would turn to McCarty if the certificate sought in this proceeding were granted to it.

■ Even conceding that a grant of the McCarty application will have some adverse effect upon the previously existing carriers, that factor alone cannot be decisive. That loss to competitive carriers can be overbalanced by the gain to the public from better service. This court stated the applicable rule in *State ex rel. Pitcairn v. Public Service Commission*, 232 Mo.App. 755, 111 S.W.2d 982, 987 (1937), as follows:

"True, appellants and other carriers may lose some business; but, if the public generally will be benefited thereby, such benefits may, and the commission evidently thought they did in this case, outweigh the damage resulting to the public through loss of business by any particular utility."

See also *State ex rel. Beaufort Transfer Co. v. Clark*, 504 S.W.2d 216 (Mo.App.1973); *Midwest Coast Transport, Inc. v. Interstate Commerce Commission*, 536 F.2d 256, l.c. 260 (8th Cir. 1976); *Twin City Freight, Inc. v. United States*, 360 F.Supp. 709, 714 (D.C. Minn.1972).

■ The balancing process by which the loss of business to competitive carriers is weighed against the authorization of additional service to the public is peculiarly within the Commission's discretionary exercise of its expertise in the field of transportation. As stated in *State ex rel. Beaufort Transfer Co. v. Clark, supra* at l.c. 219: "The Commission must decide when the evidence indicates that the public interest will be served by the award of authority to an additional competitive carrier, and it is not within the province of the appellate court to upset that decision so long as there is substantial evidence that such service is in the public interest." See also *Midwest Coast Transport, Inc. v. Interstate Commerce Commission, supra*; and Hirschbach, "Public Convenience and Necessity in Federal Motor Common Carrier Cases—What are the Criteria?", 16 S.D.L.Rev. 351, l.c. 378. The conclusion reached by the Commission in this case was well supported by the evidence and will not be disturbed.

## II.

### FAILURE TO HOLD AN OPEN MEETING

Appellants' second major assault upon the Commission's order drives at the lack of any open public hearing for the purpose of voting upon and adopting that order. Appellants contend that the alleged failure to hold a meeting violates the statutory requirements of Section 386.130 and Chapter 610. Appellants' position has received some

vindication in the recent Supreme Court en banc decision of *State ex rel. Philipp Transit Lines, Inc. v. Public Service Commission,* 552 S.W.2d 696 (Mo.1977) which was handed down subsequent to the submission of the present case.

In *Philipp Transit Lines,* the Commission followed a system of "notational voting" under which a proposed order would be circulated to each commissioner together with a notational voting sheet. Each commissioner individually would then consider the proposed order and indicate his concurrence or dissent on the sheet. In this way, an order could be adopted pursuant to individual concurrences without the commissioners ever meeting together in a body. The Supreme Court held that the notational system of voting (which it remarked was "frequently employed by the P.S.C.") violated Section 386.130 which calls for and requires collegial action at a meeting of the Commission at which a quorum is present. It further held that this violation made the Commission's order voidable and subject to attack in the proceeding for review. Having concluded that the notational voting in that case called for reversal, the Supreme Court found it unnecessary to determine whether the resulting lack of an open meeting also violated Chapter 610, the Open Meetings Law.

■ The present case differs substantially from *Philipp Transit Lines* in that the record here does not disclose whether the notational voting method was used, and there is no concession by either the Commission or by McCarty that such was the case. This court cannot properly go outside the record to convict the Commission of error. Moreover, appellants made no complaint of any violation of Section 386.130 in their application for rehearing before the Commission and this point therefore has not been properly preserved for review as required by Section 386.500(2) of the statutes.[3]

This, however, does not conclude the inquiry because appellants also complain and place even heavier emphasis upon the Commission's failure to hold an open hearing in compliance with Chapter 610. They say that the failure to hold an open meeting is shown by the fact that the record contains no notice by the Commission of a special meeting as would have been required by Section 610.020, together with the fact that the Commission did not adopt its General Order No. 62 providing for regular public meetings of the Commission until approximately four months after entry of the Commission's Order in the present case. (No notice is required under Section 610.020 for "regular meetings established by . . . regulation of the body.") For the purposes of this opinion, we shall assume that the Commission did not comply with Chapter 610. We shall further assume for the purposes of this opinion that a violation of Chapter 610 makes the resulting Order voidable, just as does a violation of Section 386.130, although the Supreme Court specifically refrained from so deciding in *Philipp Transit Lines.*

■ Even with the benefit of those assumptions, appellants are confronted with the insurmountable objection that they have waived any objection to a violation of Chapter 610 by not having included that point in their application before the Commission for a rehearing. Appellants recognize their difficulty in this respect, stating in their brief: "The second significant question raised by this appeal is the effect of the Commission's failure to comply, or to certify compliance, with the Open Meetings Law, chapter 610 R.S.Mo.1973 Supp. That question, however, was never raised in an application for rehearing to the Commission; hence, before it may be considered here, appellants must establish that they have not waived the specific issue."

Appellants seek to avoid such a waiver on two grounds. They first ask this court to

---

**3.** In their Point Relied Upon No. 3, appellants undertake to excuse their failure to preserve their complaint concerning the alleged violation of Chapter 610, but they make no contention

that they should be relieved of their waiver of any complaint respecting failure by the Commission to comply with Section 386.130.

review the question in its discretion under the doctrine of plain error as specified in Rule 84.13(c). We fail to find that any manifest injustice or miscarriage of justice has resulted from the alleged error. This case therefore does not present a proper occasion for the exercise of the discretion sought to be invoked.

 Appellants further argue that this point should be considered on the theory that a violation of the Open Meetings Law is a jurisdictional defect which is exempted from the doctrine of waiver. The flaw in this argument is that there is nothing in the nature of this requirement and nothing in the language of the statute which makes the holding of an open meeting jurisdictional. The failure to hold an open meeting can be no more than a procedural error which must be properly preserved for review as any other. This was so held in *Chung-Ling Yu v. Criser*, 330 So.2d 198, l.c. 203[9] (Fla. App.1976).

The cases cited by appellants on this issue have all been examined and each of them is either not in point or is more against appellants than in their favor.

Affirmed.

All concur.