**STATE ex rel. INMAN FREIGHT SYSTEM, INC., and Sanders Truck Line, Inc., Relators-Respondents,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent,**

and

**W–K Warehouse & Delivery Service, Inc.,**
**Intervenor-Respondent-Appellant.**

No. WD 30854.

Missouri Court of Appeals, Western District.

June 9, 1980.

W. R. England, III, Jefferson City, for W–K Warehouse & Delivery Service, Inc.

Paul W. Phillips, Arthur L. Conover, Jefferson City, for Missouri Public Service Commission.

Herman W. Huber, Jefferson City, for Inman Freight System, Inc., and Sanders Truck Line, Inc.

Before WASSERSTROM, C. J., Presiding, and PRITCHARD and KENNEDY, JJ.

WASSERSTROM, Chief Judge.

The question for determination here is whether the Public Service Commission properly granted a certificate of public convenience and necessity as a common carrier to W–K Warehouse & Delivery Service, Inc. (W–K). On a petition for review, the cir-

cuit court held in the negative. We reverse.

W–K is solely owned by its president, Carl H. Kastner. Kastner has been engaged in the trucking industry for twenty-five years, twenty of which was as a truck driver. He began his own trucking business in 1971, and the business was incorporated in 1974. The corporation at the time of the hearing before the Commission owned four trucks, had other trucks readily availably to it for leasing, and operated a warehouse in Crystal City, Missouri.

This company was incorporated upon a very thin financial structure. The initial capital consisted of only $500, with a stockholder loan on which the balance in August 1975 was $23,021. In 1975 the company showed a profit of $1,476. However, the retained earnings accounted showed a deficit of $1,862, and the liabilities of the company exceeded its assets by $1,362. It should be noted, however, that the net worth of the company would be positive except for accumulated depreciation in the amount of $27,-051.

Prior to 1976, W–K conducted its trucking operation in the St. Louis commercial zone and in the area to the south along Interstate Highway 55. Operations within the St. Louis commercial zone are exempt from regulation and need no certificate of public convenience and necessity from the Public Service Commission. Also exempt is all transportation by trucks of less than 6,000 pounds per vehicle. However, W–K did in fact, and with some regularity, operate on Highway 55 south of St. Louis vehicles which exceeded the 6,000 pound exemption. This resulted in a citation from the Commission to W–K in 1975 and eventuated in the payment of an agreed fine of $200.[1]

On October 20, 1975, W–K filed the present application seeking authority to operate over irregular routes within an area comprised of the St. Louis commercial zone and extending from the limits of that zone southward through a corridor five miles on each side of Interstate 55 to the intersection of that highway and Missouri State Highway 32. Applications to intervene were filed by protesting truck lines, including, among others, Inman Freight System, Inc. (Inman), Sanders Truck Line, Inc. (Sanders) and Truck Transport Inc. (Truck Transport). Those applications for intervention were granted and hearings commenced in January 1976. During the course of the January hearings, Kastner took the stand as a witness and freely admitted that despite the citation which had been issued by the Commission and the fine paid by him, he was continuing to operate trucks in excess of 6,000 pounds south of the exempt St. Louis commercial zone.

At that point, an intermission in the hearing occurred, and W–K filed an application for temporary permit to operate under the pending application. The Commission declined to grant such authority, in large part because of the existing violations of law by W–K; and as part of the order denying the application for temporary authority, the Commission ordered W–K to cease and desist from any further violation. When the hearings resumed in April 1976, Kastner again took the stand and testified that W–K had discontinued any shipments outside of the exempt category. This testimony was confirmed by Mr. Gary Sublett, Chief of Enforcement of the Missouri Public Service Commission.

The affirmative testimony presented by W–K in support of its application went generally to the need of business people in the area desired to be served by W–K for deliveries on the same day on which an order was made for shipment. A considerable number of the W–K customers testified to the essential nature of this service so far as their respective businesses were concerned. These witnesses also testified that no other common carriers offered the same service. They also testified to a considerable amount of delays by other carriers, damages to shipments which occurred on

1. W–K also engaged in unauthorized for-hire transportation in interstate commerce, which resulted in the Interstate Commerce Commission securing a federal court injunction against W–K.

the lines of other carriers, and unsatisfactory handling of claims by these other carriers. These witnesses testified uniformly that they had no such complaints with respect to the service offered to them by W–K.

The witnesses on behalf of the intervenor-protestants testified that it was impractical and uneconomical for them to offer "same-day" service but that the service offered by them was usually over night—that is to say, the shipment was delivered the day after the order was received. These witnesses testified that the few delays testified to by W–K witnesses constituted rare exceptions, and that the number of damaged shipments constituted only a very small percentage of the total volume carried by these carriers. Inman testified that the business done by it in the area sought to be served by W–K constituted approximately 10% of the total Inman volume, and Sanders testified that its volume of business in the same area constituted approximately 19% of its total volume. Both of those carriers and also Truck Transport testified that a granting of the W–K application would result in a diversion of business from them which would be detrimental to the protestants.

After considering all of the evidence, the Commission found that there was a public need for the services sought to be provided by W–K:

"The Commission finds that the service which is convenient and necessary for witnesses supporting the application is same day service. This service is not now satisfactorily provided by the carriers presently holding authority to serve the area in question. Some same day shipments required by those in support of the application cannot be carried on vehicles of 6,000 pounds or 9,000 pounds gross weight or under. * * * In this particular case, the presently certificated carriers do not provide same day service from the St. Louis commercial zone to the area desired to be served by Applicant. The present carriers are not providing the service then that is sufficiently convenient and necessary to meet the requirements of the shippers and receivers serving the areas desired to be served by the Applicant. The commission finds that the manner of providing next day or day after service by the presently certificated carriers is satisfactory. In other words, the Commission does not find that the few alleged instances of delay or difficulties with claims justify the granting of additional authority. However, the failure to provide the kind of carriage demanded by shippers, as opposed to the failure to supply that carriage in a satisfactory manner serves as the basis for this Commission's finding that the public convenience and necessity will be served by the addition of another carrier serving between the St. Louis commercial zone and the other territory desired to be served by the Applicant."

The Commission further held that W–K was qualified to perform the services in question. And the Commission still further found that denial of certification to W–K would not be justified on the basis of any adverse effect to the protestants:

"In reaching this decision the Commission finds that while there may be some negative effect on existing carriers, the effect, because of the limiting of the authority as hereinafter set out, will be outweighed by the added convenience to the shipping public and the necessity to provide the service requested."

The Commission therefore granted the application, except that it did not agree to the interlining of W–K with other carriers. The Commission further granted interstate authority to W–K, within the limits of the intrastate authority granted, pursuant to 49 U.S.C. § 306(a)(6).

After the overruling of their application for rehearing before the Commission, Inman and Sanders filed their petition for review in the circuit court. Intervention in that court was sought by and granted to W–K. After consideration, the circuit court found that the Commission's report and order was not based upon competent and substantial evidence. More particular-

ly, the court found that W–K had failed to sustain the burden of proving that it was financially fit and qualified to perform the service proposed, and the court further expressed the view that the report and order failed to give reasonable consideration to the service being furnished by existing common carriers and the effect which the proposed certification would have upon those existing carriers. The circuit court therefore reversed the Commission, but it granted a stay to W–K pending appeal to this court.

## I.

### Scope of Review

■ Before turning to a discussion of the specific issues, it will be well to recall briefly the well settled limitations upon judicial review of orders by the Public Service Commission. The court is not authorized to weigh the evidence heard by the Commission; the findings of the Commission are prima facie correct and the challenger carries the burden of making a convincing showing that those findings are not reasonable and lawful; the findings of the Commission will not be disturbed if they are supported by substantial evidence and once the authority has been granted by the Commission, the protestants must assume the burden of proof of showing that the Commission's findings are not so supported. *State ex rel. St. Louis-San Francisco Railway Co. v. Public Service Commission*, 439 S.W.2d 556 (Mo.App.1969); *State ex rel. Churchill Truck Lines, Inc. v. Public Service Commission*, 555 S.W.2d 328 (Mo.App.1977).

## II.

### Qualification of W–K

The attacks by the protesting carriers against W–K's qualifications center upon: (a) W–K's financial status; and (b) past violations of the law by W–K.

With respect to W–K's financial situation, the protestants emphasize its operating net loss and negative net worth. On the other hand, W–K does own substantial equipment and facilities, and it has served its customers satisfactorily for a number of years. Moreover, its financial earnings may very well improve once it has the requested certificate and after it is able to operate freely without any restraint upon its load limit.

The Commission specifically considered the W–K financial stringency but nevertheless observed: "W–K's financial condition, though not otherwise impressive, would enable Applicant to begin to provide the transportation service it seeks authority to provide if the requested authority is granted." Under somewhat like circumstances, the Federal Motor Carrier Commission has also been liberal in approving applications despite some financial weakness on the part of the applicant. *Spokane, Portland & Seattle Transportation Co.*, 26 M.C.C. 260 (1940); *Becker Transportation Company, Inc. Extension of Operations*, 30 M.C.C. 355 (1941); *Brown's Connecticut Airport Service Inc. Conversion*, 103 M.C.C. 6 (1966); *Hever Truck Lines, Inc., Ext. Fresh Meats*, 81 M.C.C. 218 (1959). *Cf. Midwest Coast Transport, Inc., Ext. Dairy Products*, 53 M.C.C. 355 (1941). As summarized in 1 CCH Federal Carrier Cases para. 56.01: "In the pioneering stage of the development of a new line financial losses may be expected. Initial indebtedness is not proof absolute of unfitness." The finding here by the Commission, that W–K is financially qualified, cannot be said to be unreasonable.

The factor of past violations of the transportation laws by W–K is a serious matter which did receive serious consideration by the Commission. Nevertheless, W–K after the issuance of a cease and desist order took heed and did thereafter conform to all requirements of law.[2]

2. Protestants argue that W–K had violated and continued to violate the law after April, 1976, by using a 24,000 lb. truck to pick up shipments within the St. Louis commercial zone and the reloading from that truck onto smaller trucks for transportation to points outside that exempt zone. However, neither the Commission nor the circuit court found that practice to

■ Where an applicant has been guilty of past violations, there are cases both denying, but also cases granting, the application. Thus past violations caused denial of applications in *Re: Raymond Ottmann,* 12 Mo.P.S.C. (N.S.) 580 (1966) and *Re: James Q. Rogers,* 13 Mo.P.S.C. (N.S.) 108 (1966). On the other hand, applications were granted despite past violations in *Re: Paul Gardner,* 2 Mo.P.S.C. (N.S.) 629 (1950) and in *Re: Martin Truck Line, Inc.,* 12 Mo.P.S.C. (N.S.) 98 (1965). This matter should be permitted to rest within the discretion of the regulatory agency. As held in *Armored Carrier Corporation v. United States,* 260 F.Supp. 612 (E.D.N.Y.1966), aff'd per curiam 386 U.S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967): "The argument that past willful violations should, per se, bar a grant of authority in the present and for the future is one that looks backward and appears transfixed. Examination of the past should only be useful in assessing the prospective conduct of the applicant. Such assessment is one peculiarly within the expertise of the I.C.C. and should not be interfered within unless found to be arbitrary and capricious."

### III.

### *Public Need*

■ Protestants argue that a carrier should not be expected to grant same day service and that their service on a "next day" basis should not be adjudged deficient. They cite in that regard *Re: Joseph T. Dailey d/b/a Pacific Express,* 7 Mo.P.S.C. (N.S.) 57 (1956). That case does contain some general language supporting protestants, but the decision in that case is explained by the fact that the Commission there concluded from the evidence "that there is insufficient business in the area where the Applicant proposes to serve to warrant the operation of another common carrier; that if such business or a substantial part thereof is lost to the protestant that it would be severely and detrimentally affected; that the public convenience and necessity will not be promoted, and that the

be illegal, and the practice seems to be sanctioned by *State ex rel. Lee American Freight*

public interest will not be served by granting the authority requested."

The Commission here was faced with facts which it considered to be different and upon those differing facts reached differing conclusions. In view of all of the evidence, the Commission was not unreasonable in concluding that there was a public need in this area for "same day" service.

■ The protestants also contend that the W–K evidence was insufficient in that it did not produce as witnesses any shippers or consignees in that part of the area south of Crystal City and Festus. It is, of course, unnecessary for an applicant to produce witnesses from every single point within the area sought to be served. *State ex rel. Churchill Truck Lines, Inc. v. Public Service Commission, supra.* This observation is particularly true of the relatively small area now in question which is only approximately 45 miles long and 10 miles wide. In any event, protestants' argument ignores the fact that W–K offered evidence that it was serving all of the area including the portion as far south as Ste. Genevieve, and this was confirmed by the testimony of Sligo Industrial Tool & Supply, Inc., which shipped goods from St. Louis by W–K to various parts of the area including the southern portion brought into question by protestants.

### IV.

### *Competitive Effect*

■ The protestants argue strenuously that the certification of W–K will have a severe adverse economic effect upon them. This fact was of course considered by the Commission and held not to overbalance the public need and convenience. That determination rested within the discretion and expertise of the Commission. *State ex rel. Churchill Truck Lines, Inc. v. Public Service Commission, supra,* and cases cited therein.

The judgment of the circuit court is reversed.

All concur.

*System, Inc. v. Public Service Commission,* 411 S.W.2d 190 (Mo. banc 1967).