**STATE ex rel. CHURCHILL TRUCK LINES, INC., Appellant,**

v.

**PUBLIC SERVICE COMMISSION OF the STATE OF MISSOURI, American Freight System, Inc., Graves Truck Line, Inc., Hyman Freightways, Inc., and Next Day Motor Freight, Inc., Respondents.**

**No. WD 38779.**

Missouri Court of Appeals, Western District.

July 28, 1987.

Frank W. Taylor, Patrick K. McMonigle and Rhonda S. Loeppke of counsel: Dysart, Taylor, Penner, Lay & Lewandowski, Kansas City, for appellant.

Paul H. Gardner, Asst. Gen. Counsel, Jefferson City, for Missouri Public Service Com'n.

E. Richard Southern, Jefferson City, for American Freight System.

Harvey Tettleman, Jefferson City, for Next Day Motor Freight, Inc.

James C. Swearengen and Stephen Newman, of counsel; Hawkins, . Brydon &

Swearengen, for Graves Truck Line, Inc., and Hyman Freightways, Inc.

William C. Reine, Jefferson City, for Hyman Freightways, Inc.

Before LOWENSTEIN, P.J., and PRITCHARD and TURNAGE, JJ.

PRITCHARD, Judge.

Public Service Commission (PSC) granted intrastate carrier authority to respondents by Report and Order, and the Circuit Court of Cole County, Missouri, affirmed.

In 1983 Orscheln Express, Inc., terminated its Missouri intrastate trucking operations. Appellant, Churchill, thereafter filed an application for intrastate authority over certain described routes and points of origin and destination. Beaufort Transfer Company also filed an application for intrastate authority, and PSC granted authority to it and Churchill. The four respondents, American, Graves, Hyman and Next Day also filed for intrastate authorities, which were granted. Churchill and Beaufort filed petitions for review in the Circuit Court as to the grant of the American, Graves, Hyman and Next Day authorities.

The trial court found that the order of PSC with respect to the four latter carriers was lawful, reasonable and supported by substantial and competent evidence on the whole record, with the exception of a portion of Next Day's authority which was remanded to PSC, and which is not here involved. Churchill alone appeals from the trial court's judgment.

Orscheln Express, Inc., a successor to Orscheln Bros. Truck Lines, Inc., late in 1983 terminated its intrastate trucking authority in Missouri, and Churchill, followed by Beaufort, then applied for further intrastate authority, they having possessed broad Missouri intrastate trucking rights acquired over a long period of time prior to 1983. The four respondent truck lines also applied for authority, and the six cases were consolidated by PSC's order, the propriety of which is one of the points on this appeal.

The extensive grants by PSC of intrastate authority to the six applicants are somewhat overlapping and duplicative. Generally, Churchill and Beaufort, in addition to their prior authority, were granted routes and points of origin and destination in northern Missouri. American was granted north Missouri authority from Hannibal to St. Joseph over U.S. 36; over I–70 from St. Louis to Kansas City, and extensive routes in south Missouri. Graves was granted authorities for service in north Missouri, and certain routes in south Missouri. Hyman was granted intrastate regular route authority over much of Missouri. Next Day was granted irregular route authority over much of Missouri. Irregular route authority for transportation of general commodities was granted to the four respondent carriers "irrespective of the location of such points on the route or routes of regular route carriers".

PSC received testimony from representatives of intrastate shippers. Central Hardware of Bridgeton, Missouri receives merchandise from several Missouri points. Central supported the applications of American, Hyman and Next Day. Its Director of Transportation, James Keithley, was dissatisfied with transit time on intrastate shipments and existing truckload rates. He gave as an example of rate differences a $365 cost of shipping 17,000 pounds by railroad piggyback as compared to two intrastate truck costs of $439 for 9,500 pounds and one for 5,500 pounds at $401, both higher than the piggyback cost. Central uses private carriage to pick up full truckloads at Sweet Springs because Missouri intrastate rates are so high at that point that Central can afford to run one way empty and return with a load.

John Johnson is Regional Traffic Manager for Purex Corporation, which manufactures and distributes household cleaning and food-line products. Purex supported Churchill and Graves in these proceedings. Johnson testified that relaxation of interstate entry controls [deregulation] has saved his company about $12 million in the last three years, and attributed the savings to greater competition which also generated improvements in service. He opined that selection of Missouri intrastate carri-

ers was not satisfactory, and complaint to the regulatory agency was no substitute for competition. As an example, Purex can ship interstate to Kansas City, Kansas, from St. Louis for $284 as compared to an intrastate shipment within Missouri for $448.

St. Louis Lever Brothers Company's Traffic Manager, Carl Siboda, testified that Lever Brothers, which supported Hyman, at one time benefitted from attractive intrastate rates to Springfield and Joplin, which rates were subsequently dropped. Siboda noted that in a PSC hearing on a 1984 application by Churchill for broad grants of authority in southwest and southeast Missouri, he learned that a protestant, Beaufort, would provide Lever Brothers with a lower commodity rate, which solicited Lever Brothers truckload business thereafter.

Hyman's application was supported by Bennie Abbott, who was in charge of McGraw-Edison shipments from North Kansas City. In Abbott's experience, discounted interstate rates were less than those prescribed for Missouri intrastate rates. Hyman and American were supported by Keith Lohr, Distribution Manager for Pfizer, Inc., of Lee's Summit. Lohr indicated that general commodity trucking on the interstate level is more competitive than intrastate in Missouri, a premium being paid for the latter shipments. Interstate discounts are had of about 35% for long haul and 30% for short haul. Graves Truck Line's Fred Koup testified that any discount in excess of 25% on the interstate level would be less than the prescribed Missouri intrastate rates.

Farmland Industries of St. Joseph projected $34 million worth of freight for 1984, and its Purchasing Supervisor, Hubbard, estimated 15 to 20% would be shipped intrastate in Missouri. Farmland had experienced billing problems and lost shipments in Missouri intrastate movements, and it supported American because it sought better service and more competitive pricing in the state. In Hubbard's experience, carrier rates intrastate were higher than rates he could get interstate.

Allis Chalmers Manager of Transportation Services, Lou B. Miller, testified that both intrastate service in Illinois and interstate service in Missouri are superior to Missouri's intrastate level. Allis Chalmers had negotiated consistent 40% discounts from interstate major carriers, and it had received no discount rates from Missouri intrastate carriers.

Kansas City's PBI Gordon Corporation manufactures chemicals, herbicides and pesticides. According to its Transportation Manager, Williams, the company was receiving about 47% interstate competitive discounts, with some increases to 57%. No Missouri intrastate carrier gave discounts and none offered any. PBI Gordon had used special drop-offs by interstate carriers because costs of general commodity intrastate carriers such as Churchill and Beaufort were too high. Williams supported Next Day's application because Churchill declined to provide him with a 40% intrastate discount rate.

William J. Hartwell of A.P. Green Refractories in Mexico, Missouri, appeared in support of all six applications. He testified that freight rates for the company's products would be lower as a result of competition. It had received interstate discounts ranging from 15 to 30%. No discounts were received on Missouri intrastate moves, and none had been offered.

With respect to the public need for improvement in the quality of service by intrastate carriers, Donald Salenger, Department Manager of Distribution and Traffic for UARCO, in Kennett, Missouri, which manufactures custom-printed forms, computing machine paper, pressure-sensitive labels, preprinted envelopes and supplies for the printing industry, testified: The company ships between 2 and 3 million pounds per year from Kennett to 70 or 80 Missouri cities. In its three years of existence, the company has found a serious problem in securing fast, efficient transportation to a number of state points from Kennett, which include late shipments, dissatisfied customers and lost business. The only intrastate authority out of Kennett is protestant Elfrink Trucklines, which does

not give the kind of service the company needs to compete in the marketplace, which requires orders to be delivered within 300 to 400 miles within one day, and the company has been unable to deliver to many Missouri points in one day. UARCO requested Elfrink to file for as much intrastate authority as possible, but it declined to do so. By way of comparison of services rendered by interstate and intrastate carriers, Salenger gave as examples the interstate overnight services to Birmingham, Alabama, and Nashville, Tennessee, respectively, 300 and 200 miles from Kennett, which came about by reason of vigorous competition among several carriers. UARCO was able to get delivery to Birmingham in the same time as a major company competitor located about 30 miles from that city. The same thing cannot be done in Missouri.

VWR Scientific of St. Louis handles photographic supplies and ships an average of 22,000 pounds per day in intrastate Missouri. Its Traffic Manager, Daniel Boone, indicated he had trouble getting next-day service in the old Orscheln territory, and no protesting carrier called him for sales. He supported Hyman, and had received good service from Next Day on their 100 pound and under authority, and used it for shipments into rural Illinois where most points are covered and he does not have to interline.

B–Mark Pools in Jefferson County distributes swimming pools, hot tubs, jetted bath tubs and supplies. It uses its Lenexa, Kansas, plant to ship into Missouri because it can get better service from there than in Missouri intrastate—its traffic manager, Carthel Smith, stated that if he wants next-day service to Hannibal, Missouri, he must ship from Lenexa, Kansas.

West Agro, Inc., of Kansas City, manufactures supplies for dairy products. Its Traffic Coordinator, Pierre Berube, testified in support of Next Day and American. He had worked in a traffic capacity in California, and stated that the intrastate situation in that state after market entry was relaxed, caused the market area to open up with many carriers which would seek out service. Some carriers did not make it financially, but those that did were helping to keep the market open and more competitive with better service available to rural areas.

Data Documents, Inc. manufactures computer materials with three loading docks in Kirkwood, Missouri, for intrastate Missouri shipments. It seeks service from Graves to the communities of Boonville, Centralia, Columbia, Fayette, Fulton, Hannibal, Independence, Jefferson City, Kansas City, Marshall, Mexico, Moberly, Montgomery City, St. Louis, St. Joseph, Sedalia, Springfield and Warrensburg. According to Data's Director of Distribution, the fragmentation of operating authority in Missouri has imposed an administrative burden and prevented the company from engaging in transportation activities as it is able to do on the interstate level and in other less rigidly regulated states than Missouri.

Webb Forms, Inc., Webb City, Missouri, manufactures continuous business forms and custom stock, with major intrastate traffic to St. Louis, Kansas City, and Springfield. It solicits business throughout Missouri, with an average of 20 to 30 outbound intrastate common carrier shipments per month. Webb's Vice President, General Manager and part-owner, gave the opinion that interstate motor carrier service is substantially better than intrastate service because of greater competition, which has resulted in more flexibility which is necessary in his business because of rush situations. Webb supports American's application.

Nelson G. Perrey operates two businesses having to do with water purification from central Missouri. He supported the applications of Next Day and Hyman. He was extremely critical of intrastate transit time in Missouri, saying that it was next to impossible to find another carrier since Orscheln withdrew. He had extremely serious problems securing two day service into southeast Missouri. In contrast to Missouri intrastate, service time is excellent from outside the state. Increased interstate competition has resulted in reduced rates and better service.

The voluminous record here contains the testimony of many other witnesses who appeared in support of the applications of the four respondent carriers. Ninety-five witnesses appeared for American representing 18 points it desired to serve. For Graves, 21 witnesses appeared representing 8 cities it desired to serve. Hyman presented 32 witnesses from 5 points it desired to serve. Next Day presented 40 witnesses, 14 from the Kansas City area; 19 from the St. Louis area; and 7 from rural areas of the state. Although many of these witnesses had no specific complaints about transportation service, and were presently served by several carriers, those who did complain based it generally on rates, marketing, slow claim payments, slow transit time, slow pickup time, dock congestion, interlining costs and delays, forced interlining, and superior interstate service. ["Interlining' is the transfer of goods between carriers for the through movement of freight from origin to destination. See *Garrett Freightlines, Inc. v. United States*, 353 F.Supp. 1329, 1331 (W.D.Wash.1973).]

PSC requested that its staff participate in processing the six consolidated applications. One of the participants was Dr. Curt Hutsell, who was employed by PSC as Chief Transportation Economist. Dr. Hutsell testified that intrastate rates in past years have been extraordinarily high. During a 1982 period when audits were conducted by the Commission Staff, Dr. Hutsell found that a reasonable rate of return on rate base for ten test carriers was between 13.5 to 16%, and seven out of ten of the test carriers were found to be earning revenues in excess of revenue requirements (supranormal profits). In certain instances the excess amounted to several hundred thousand dollars. It was Dr. Hutsell's belief that additional competition in the current marketplace of intrastate general commodity carrier service in this state would benefit the shipping public. He favored the grant of respondent carriers' applications and an easier entry into the marketplace by such carriers, which would reduce interlining and shipper costs. Although Dr. Hutsell was in favor of complete deregulation of the trucking industry in Missouri, that action has not been taken by the Legislature. He favored the setting by PSC of maximum rates under which competing carriers could charge lesser rates.

Dr. Hutsell stated that carrier operating rights have a market value because they are artifically restricted, and represent the "capitalized value of the expected future excess over normal competitive returns". This concept is illustrated by the testimony of Beaufort's president, that it paid $180,-000 for the intrastate operating rights formerly held by Texas-Oklahoma Express.

John Richard Felton, Ph.D., a professor of economics at the University of Nebraska at Lincoln, was called as a witness in behalf of the four respondent applicants. It was Dr. Felton's opinion that increased competition in the trucking industry is a proper criterion to be used within the context of the existing Missouri statutory framework to determine whether or not public convenience and necessity will be promoted or that there is a public need for the creation of the service sought to be provided by the four applicants. His opinion was the result of his professional education and training and knowledge of the trucking industry which led him to believe the trucking industry is inherently competitive (later modified to include only unregulated trucking industry); competition promotes public interest by creating incentives to keep rates in line; it increases the number of service-rate options available to shippers and promotes their satisfaction; restrictions on motor carrier competition injures small shippers and sparsely populated areas; and restrictions on competition have served mainly to induce waste and inefficiency rather than to enhance profits of carriers protected by regulation.

Dr. Felton compared the effect of the federal Motor Carrier Act of 1980, which required the ICC to eliminate gateway restrictions and other limitations which would impose circuitous routes on carriers. ICC created a presumption in favor of entry and competition once an applicant had come forward with some information showing

the utility of its proposed service. In 1976, before the easing of entry constraints, there were 6,746 requests for new and explanded interstate permanent operating rights, 70% of which were approved; in 1981 there were 28,414 requests, 70% of which were approved; in the first 23 months after adoption of the Act, ICC approved 43,000 requests for operating authority, 8,000 of which related to carriers not previously certificated by ICC. The expansion has occurred primarily in the smallest size class.

With respect to the effect of the authorities sought by the four respondent carriers upon existing (certificated) carriers, Dr. Felton gave the opinion that it would not result in a reduction of overall service or increased cost to the public. In fact, the contrary would occur in that the increased competition in the Missouri trucking industry will bring about greater efficiency and cost savings to the shipping public and public at large.

The Middlewest Motor Freight Bureau is made up of carriers who hold Missouri operating authority. Its member carriers formulate and propose rate increases to be presented to PSC, which culminates in a vote by carrier representatives which are members of the General Rate Committee (GRC). Carriers such as respondents are barred from voting on intrastate rate proposals. Prior to the GRC vote, the Bureau invites the entire Missouri membership to attend meetings where revenues and expenses of carriers are discussed.

The parties agree that portions of § 390.-051, RSMo 1978, contain guidelines to PSC in making its decision:

"5. If the commission shall find from the evidence that public convenience and necessity will be promoted or that there is public need for the creation of the service proposed, or any part thereof, and that the applicant is qualified properly to perform the service proposed and to conform to the provisions of sections 390.011 to 390.176 and the requirements, rules and regulations of the commission established thereunder, a certificate therefor shall be issued.

6. In determining whether a certificate should be issued, the commission shall give reasonable consideration to the transportation service being furnished by any common carrier by rail or motor vehicle and the effect which the proposed transportation service may have upon such carriers; provided, that the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing."

Appellant first contends that the court below erred in affirming PSC's Report and Order because it was not based on competent and substantial evidence to prove the existence of a public need for the four grants of authority in that many of the public witnesses testified that existing service was good and no additional service was needed, and the testimony presented was from an insufficient number of locations to justify the breadth of the applications granted.

In support of its contention, appellant argues and refers to a PSC decision rendered about six months before the instant proceedings were initiated, R.L. Conner, d/b/a Conner's Express, 26 Mo. P.S.C. (N.S.) 601. Appellant says that PSC failed to follow that previous decision's criteria for proving a general commodity extension application in that, as that decision sets forth, (1) "[A]n applicant must first establish that there is a shipper or shippers who desire to use his service"; (2) "The shipper evidence must establish that the shipper has product to ship to points requested to be served by the applicant in sufficient quantity and frequency to warrant an establishment of the proposed service."; and (3) "This shipper evidence must establish that, for whatever reason, the shipper has been unable to ship his product as he requires." Appellant says that the first two criteria are not mentioned in the Report and Order. On the third criteria, appellant says there is no evidence or finding that any shipper has been able to ship its prod-

uct as it requires. Appellant's contention and argument must fail because an administrative agency is not bound by the doctrine of stare decisis. "The mere fact that an administrative agency departs from a policy expressed in prior cases which it has decided is no ground alone for a reviewing court to reverse the decision." *City of Columbia v. Missouri State Board of Mediation,* 605 S.W.2d 192, 195 (Mo.App.1980). See also *State ex rel. Transport Delivery v. Burton,* 317 S.W.2d 661, 665 (Mo.App. 1958); and note *State ex rel. Associated Natural Gas Company v. Public Service Com'n,* 706 S.W.2d 870 (Mo.App.1985), which affirmed PSC's denial of a rate increase to appellant which was based upon a consideration of the financial structure of its parent corporation, known as "double leveraging" in determining rates. The court said that the fact that the Missouri Commission had never before applied double leveraging is of no consequence, and "Not only can the Commission select its methodology in determining rates and make pragmatic adjustments called for by particular circumstances, but it also may adopt or reject any or all of any witnesses' testimony." *Associated Natural Gas Company,* supra, 706 S.W.2d at 880[9].

What PSC has here done is to adopt the salutory approach of the need for increased competition, which, according to Dr. Felton, has proved to be beneficial at the federal level under the Motor Carrier Act of 1980. The evaluation of Dr. Felton's expert testimony and that of Dr. Hutsell was for PSC. Associated Natural Gas Company, supra, page 880[9]. The evidence from the various shippers above set forth points up the need for more competition among intrastate carriers, whose charges are considerably above those of interstate carriers where discounts are given to shippers. Many of the shippers sought better service, such as UARCO of Kennett, Missouri, which would be better able to compete with its competitors if it had one-day service. Note also the evidence of shippers Central Hardware, Purex Corporation, McGraw-Edison, Pfizer, Inc., Farmland, Allis Chalmers, PBI Gordon Corporation, A.P. Green Refractories, VWR Scientific, B–Mark Pools, Data Documents, Inc., Webb Forms, Inc., Nelson G. Perrey, relating to unsatisfactory service intrastate as compared to that of interstate carriers, discrepancies in rates charged between the interstate and intrastate systems. The matter of rates for shipping was clearly the principal concern of the shippers, and it seems equally clear that such was a matter of principal concern of PSC, hence its preoccupation with relaxing entry requirements for carriers seeking trucking authority as contained in its Report and Order, with the probable result from increased competition, as under the evidence, has been the case in interstate shipping since the Motor Carrier Act of 1980.

█ Contrary to the contention of appellant, the evidence above set forth shows that many shippers were unable to ship products as they required in order to meet their competition and have prompt pickup and delivery of shipments. This evidence is covered fully and in detail by PSC's Report and Order.

The matter of competition in the trucking industry has long been one of proper consideration in this state under § 390.051. In *State ex rel. Scofield v. Public Service Commission,* 240 Mo.App. 603, 211 S.W.2d 547 (1948), there was an issue of whether the commission could grant another certificate to a new carrier over the same route where another carrier was operating under a certificate under the language of what is now § 390.051, that "In determining whether a certificate shall be issued, the commission shall give reasonable consideration to the transportation service being furnished by any common carrier * * * and the effect which the proposed transportation service may have on such carriers." It was said at page 551[2], "We think this language establishes the public policy of this state to be one of *regulated competition* for the benefit of the public and not one of *regulated monopoly,* insofar as common carriers using the highway are concerned." See also *State ex rel. Beaufort Transfer Co. v. Clark,* 504 S.W.2d 216, 219 (Mo.App.1973). Note that the statute goes on to say, "provided, that the issuance

of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing."

Appellant's contention that the testimony presented was from an insufficient number of locations to justify the breadth of the applications granted must be rejected. The number of witnesses appearing for each respondent, and the cities they represented are set forth above. Many points of origin and destination were mentioned by these witnesses, although they did not cover each and every one throughout the authorities sought. It would be unreasonable to require that. In *State ex rel. St. Louis-San Francisco Ry. Co. v. Public Service Com'n*, 439 S.W.2d 556, 560 (Mo.App.1969), it was held that a showing of public need "does not mean that there must be specific evidence as to need for service to each and every point to be served" on proposed routes. See also *State ex rel. Churchill Truck Lines v. Public Service Commission*, 555 S.W.2d 328, 334 (Mo.App.1977); and *State ex rel. Inman Freight System v. Public Service Commission*, 600 S.W.2d 650, 655 (Mo.App.1980). Respondent applicants did present sufficient evidence to justify PSC's grant of their entire authority sought.

■ Appellant says that PSC took the attitude that interlining is *per se* bad. PSC did not oppose interlining or hold that it could be the basis for a grant of authority. It merely noted, "In Missouri, the current route and territorial limitations on motor common carriers have forced shippers to interline extensively throughout the state. A grant of the broad authorities sought in this case will reduce or eliminate much of this 'forced' interlining resulting in substantial efficiency benefits for the shipping public. Staff, applicants, shipper witnesses, and protesting carriers have produced a plethora of testimony which demonstrates that forced interlining increases a variety of transportation costs. Specifically, the evidence shows that interlining increases

transit time, increases the likelihood of loss or damage, generates unnecessary transaction costs and inhibits rate discounting." A summary of the evidence appears in some nine pages of PSC's Report and Order. Clearly, a reduction or elimination of interlining is a proper matter for consideration in the grant of the authorities sought in the economic interest of shippers.

In its second point appellant says the trial court erred in affirming PSC's order of consolidation of the six applications. It says that "the consolidation was arbitrary, unreasonable and a denial of due process in that it resulted in a confusing and unmanageable record which could not provide a rational basis for the resulting Report and Order; the consolidation resulted in placing Appellant as applicant in one case in opposition to itself as protestant in other cases, and the consolidation prevent the Respondent PSC from giving individual consideration to the applications as required."

Section 386.410(1) RSMo 1978 authorizes PSC to adopt rules by which it shall be governed. This it has done in 4 CSR 240-2.110(18): "When any actions involving related questions of law or fact are pending before the commission, it may order a joint hearing of any or all the matters in issue, and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

The matter of consolidation arose on Next Day's motion therefor in which it set forth five reasons why it would diminish costs or delay: (1) the ability to cross-examine operating witnesses in one hearing rather than six; (2) shipper witnesses could be cross-examined in one proceeding; (3) one hearing would facilitate an examination by all protestants and applicants of the total territory being sought in all applications and thereby encourage compromise and settlement; (4) one hearing examiner could be assigned rather than six; and (5) it would facilitate either the taking of depositions, use of prehearing procedures, such as prefiled testimony or memoranda on the issues. The motion further informed that there was extensive overlapping authority in the applications pending and related

questions of law regarding need and necessity for the extensive territory.

PSC issued its order and notice which permitted each applicant and protestant to file responses. Thereafter, the commission issued its order: "The Commission has reviewed the Motion to Consolidate and the arguments in opposition to the consolidation. The Commission is aware that whether heard individually or together, the several cases pose tremendous logistical problems. The Commission is also aware that the same protestants have not protested all of the applications, and therefore should not be made to attend portions of a hearing in which they have no interest. Considering all of the issues for and against consolidation, the Commission is of the opinion there is greater benefit from a consolidation of the proceedings than if each case is allowed to be heard separately."

■ PSC's discretionary order of consolidation is clothed with a presumption of validity, and appellant carries a heavy burden of overcoming that presumption by showing unfairness in the procedure used. See *Mueller v. Ruddy*, 617 S.W.2d 466, 475 (Mo.App.1981). What appellant seems to be arguing is that the consolidation created a "lengthy, clouded and obfuscated record which has brought about an overgeneralized examination of the evidence relevant to the authority requests with only a superficial attention paid to the legislatively-mandated criteria of Section 390.051, RSMo. 1978." Appellant does not point out wherein there was an overgeneralized examination of the evidence. The record shows that PSC had before it detailed shipper evidence for each applicant, and indeed, the Report and Order reflects a careful consideration of each application. Appellant says that it as an applicant to serve a portion of the former Orscheln territory was prejudiced by being "tactically prevented from taking too strenuous a role in opposition to the remaining authority requests." Nothing is presented to show that it was in any way inhibited or prevented from opposing any of the four respondent applications. It also says that it was denied a due process right to a fair hearing

by the consolidation, but that contention was not presented in its motion to rehear before PSC, as required by § 386.500, and which under that section may not for the first time be considered by this court. PSC has properly exercised its discretion under its rule because of related questions of law or fact and to avoid unnecessary costs or delay, and appellant's second point (B) is overruled.

■ In Point C, appellant contends that PSC's Report and Order was unlawfully based upon improper findings of fact and conclusions of law concerning competition; it did not consider testimony of existing competition; and erroneously based its decision on testimony of Drs. Hutsell and Felton regarding irrelevant economic theory. The evidence set forth above from shippers' testimony is replete in regard to deficiencies of present *existing* intrastate service—delays in pickup and in delivery time, damage and delay caused by interlining, and costs above those incurred in the interstate system. Certainly, PSC considered these matters in its Report and Order. Although PSC must give reasonable consideration to the effect of proposed transportation service on existing carriers under § 390.051(6), that is a discretionary function which is balanced against the further provision of promotion of public convenience and necessity, which is the overriding consideration. *State ex rel. Missouri, Kansas and Oklahoma Coach Lines v. Public Service Commission*, 238 Mo.App. 317, 179 S.W.2d 132, 136 (1944); *State ex rel. Gulf Transport Company v. Public Service Commission, et al.*, 658 S.W.2d 448, 461[21] (Mo.App.1983).

■ The testimony of expert witnesses, Drs. Hutsell and Felton, both clearly knowledgeable in the fields of the trucking industry, was properly considered by PSC. Dr. Hutsell's opinion was that additional competition at the intrastate trucking level would benefit the shipping public, and that seven out of ten test carriers were earning revenues in excess of revenue requirements (a reasonable rate of return between 13.5 and 16%). Dr. Felton's opinion was that competition promotes public interest

**596**

by creating incentives to keep rates in line; it increases service-rate options to shippers; restrictions injure small shippers in sparsely populated areas; and restrictions on competition have induced waste and inefficiency. It was competent for PSC to utilize these economic considerations in arriving at its decision of whether in the grant of the four respondent carriers' applications the public convenience and necessity would be promoted. Appellant's contentions under Point C are without merit, and are overruled.

In Point D, appellant contends that the affirmance of PSC's Report and Order was in error because it failed to give reasonable consideration to existing transportation service and to the effect of the granting of the four applications would have on existing intrastate carriers. As noted, there was a plethora of shipper evidence of the inadequacies of existing intrastate service, and the significant lesser rate charges of the interstate service. Although § 390.051 requires that reasonable consideration of existing service be given, as said in the *Missouri, Kansas and Oklahoma case,* and the *Gulf Transport case,* supra, the public convenience and necessity is the overriding consideration. Individual carriers rights are subservient to the public interest. *State ex rel. Interstate Transit Line, Inc. v. Public Service Commission,* 234 Mo.App. 554, 132 S.W.2d 1082 (1939). There may be some diversion and loss of potential customers to other carriers, but according to Dr. Felton, there is no reason to assume that the entrance of new trucking firms will produce that effect because entry of new firms will increase traffic volume for existing carriers. This will result from a reduction in rates, and abandonment by shippers of private carriage for for-hire transport when it is efficient and of high quality. Point D is overruled.

Upon a review of the pertinent evidence in the light of appellant's contentions, it is found that there was produced substantial and competent evidence that the public need and necessity would be served by the grant of the four respondent applications. Such grant subserves a genuine and reasonable public interest in promptness and economy of service. *State ex rel. Twehous Excavating Company v. Public Service Com'n.,* 617 S.W.2d 104, 106 (Mo.App. 1981).

The judgment is affirmed.

All concur.