240 S.W.2d 952 (1951)
SCHMIDT
v.
MORIVAL FARMS, Inc.
No. 42231.
Supreme Court of Missouri, Division No. 1.
June 11, 1951.
As Modified on Denial of Rehearing July 9, 1951.
*954 Frank W. Jenny, Union, Leo A. Politte, Raymond S. Davis and Jos. T. Davis, all of Washington, for appellant.
R. G. Church, Jr., St. Louis, Joseph T. Tate, Owensville, for respondent.
LOZIER, Commissioner.
The action is one for breach of a contract of employment in which plaintiff-respondent Schmidt had judgment for $6643.34 on his petition and against defendant-appellant *955 corporation upon its counterclaims. We erred in transferring the appeal to the St. Louis Court of Appeals and that court properly retransferred the cause to this court. Schmidt v. Morival Farms, Inc., Mo.App., 232 S.W.2d 215. Although Schmidt's judgment against defendant was only for $6643.34, Schmidt also had judgment against defendant on defendant's 4 counterclaims, upon 3 of which it claimed a total of $10,900.67. The amount in dispute, exclusive of costs, exceeds $7500. Compare Jackson v. Merz, 358 Mo. 1212, 219 S.W.2d 320.
The principal issues are: the terms of the contract; whether it was void for indefiniteness or lack of mutuality; whether the corporation adopted a contract previously made by its organizer; and the propriety of the disallowance, as expenses, of certain repairs upon farm buildings and roads.
Schmidt initially sued the corporation and Joseph T. Davis, its president and majority stockholder, but later dismissed as to Davis. Count 1 of the petition alleged that: prior to defendant's incorporation Davis entered into negotiations with Schmidt for the purpose of employing Schmidt as manager of a Franklin County farm which later became the corporation's principal property; Davis offered to have the corporation employ Schmidt upon these terms: $100 monthly salary, a residence, use of a milk cow, a hog for butchering, reimbursement for reasonable expense of use of automobile and 25% of net profits realized from the operation of the farm; on or about March 1, 1946, after defendant's incorporation, defendant employed him in accordance with the proposal previously made by Davis; he began performance of his duties as manager and continued as such until February 28, 1947, when defendant terminated his services; defendant failed and refused to perform its obligations under the contract; and claimed these damages: $1200, salary, $450, failure to furnish the residence and cow, $100, car expense reimbursement, and $5017.85, net profits of operation between March 1, 1946, and February 28, 1947, a total of $6767.85.
In Count 2, Schmidt alleged that during that farm year he sold and delivered to defendant certain personal property of the reasonable value of $1102.95, and asked judgment for this sum.
In its answer, the corporation denied the alleged Schmidt-Davis negotiations, denied Davis offered to have the corporation employ Schmidt upon the terms alleged in the petition, denied "that it `agreed to compensate' plaintiff as its manager or agreed `to carry out the offer made to him by the said Joseph T. Davis'"; denied it "agreed" to pay Schmidt $100 monthly salary, to provide a residence, to furnish a cow, or to pay him 25% of the net profits; and denied that Schmidt used his car in connection with defendant's business. The answer then asserted that the defendant was organized in November, 1945, and that Schmidt was its vice-president until February 28, 1947; that Davis had no authority to negotiate with plaintiff and that no Schmidt-Davis agreement was ever authorized, approved or ratified by the corporation.
The answer then alleged that for some time prior to November, 1945, Davis negotiated with Schmidt and Schmidt's father, Otto Schmidt, for the purchase of the farm owned by the Schmidts; that the sale was consummated in January, 1946, at which time "plantiff was in charge of said land and farms and was operating same and was the owner of all the livestock on said farm, and farm machinery and equipment and by agreement between defendant and plaintiff, said plaintiff was to continue his said operations for the defendant as its manager, and to devote his entire time, attention to management of all the farm land and property of the defendant, and, as such manager, plaintiff was to take possession and take over the operations of defendant's farms as of March 1, 1946; * * that no express agreement was made or entered into between defendant and plaintiff as to compensation to be paid plaintiff, but he was to be paid a reasonable compensation."
The answer admitted that Schmidt "took over" on March 1, 1946, and operated the farm that farm year; but alleged that *956 plaintiff "breached his contract of employment as manager." In substance, defendant said, Schmidt did not properly perform his duties, did not reside on the farm, but lived on his father-in-law's farm, and there engaged in his own farm activities, and used defendant's trucks in connection therewith.
The answer then asserted "the facts to be as follows: that defendant was to pay plaintiff a reasonable compensation for his services as manager"; that it offered Schmidt a residence which Schmidt refused, that Schmidt refused the use of several of defendant's cows and that Schmidt had selected and butchered a hog; and denied that Schmidt used his car in the operation of the farm. The answer denied that the net profit was $20,069.35, admitted the correctness of several items in the income-expense statement in the petition, but denied others and asserted the existence of other items "going to the determination of net profits." Defendant asserted that an accounting would be necessary on this issue.
Answering Count 2 of the petition, defendant denied that $1102.95 was the reasonable value of the property it purchased from Schmidt.
In Count 1 of its counterclaim, defendant alleged that "when the defendant corporation was organized in November, 1945, it employed the plaintiff as its manager * * * and under said employment plaintiff agreed to devote his entire time, efforts and attention to the farming operations and the raising of livestock on defendant's property"; that as a result of Schmidt's failure to do so, and because of the use of defendant's trucks, equipment and mules in his own farm operations, defendant suffered a loss which could only be determined by an accounting. Defendant asked no specific money amount under this count.
In Count 2, defendant claimed $10,000$2500 as actual damages for farm equipment sold by Schmidt in excess of its value, in excess of its cost to Schmidt and in excess of OPA ceiling prices; and $7500 (3 times the $2500) as punative damages. In Count 3, defendant claimed $380 as alleged excess of cost to Schmidt of planting crops in 1945, and $105.67, excess above OPA prices on corn sold to defendant by Schmidt and his father. In Count 4, defendant claimed $415, alleged excess above OPA prices for hogs purchased from Schmidt by defendant ($350) and hogs purchased by Schmidt for defendant ($65).
Upon defendant's motion for a reference, the Honorable G. C. Beckham was appointed referee. The hearings lasted 7 days. The referee's report recommended that Schmidt have judgment for $5872.07 on his petition, with interest from March 1, 1947, and against defendant upon its counterclaims. After considering and overruling defendant's exceptions, the trial court entered the judgment recommended, viz.: for Schmidt, $5872.07 ($4869.12 upon Count 1, and $1002.95 on Count 2 of the petition), plus $771.27 interest, a total of $6643.34, and for Schmidt on defendant's counterclaims.
The referee found that defendant employed Schmidt upon the terms alleged in the petition. Schmidt's case as to the terms of his employment was a letter dated August 29, 1945, from Davis to Schmidt. Davis made a lengthy analysis, based upon data furnished by Schmidt, of the farm's income and expenses in prior years and estimated that the average annual net profit during the next ten years would be $4050. Davis wrote:
"In view of this situation the best that I can agree to in so far as your compensation per year would be: ¼ of the farm's net profit plus $1200 per year, besides a house to live in free of rent, one cow or the equivalent of the milk of one cow, less some quantity due to being milked and cared for at my expense, one hog and such vegetables and chickens as you care to raise. Where your car is used for farm business reasonable expenses for its use to be paid to you. I will advance you at the rate of $125.00 per month or $1500.00 per year, and then settle with you at the end of the year or other convenient times. If I do not make these payments as advances, but pay you so much per month as salary the withholding tax would have to be deducted each month.
"On the basis, then, of an average net profit per year of $4050.00, we would have: *957 ¼ of the $4050, $1012.50; additional compensation, $1200.00; total compensation for average year, $2212.50; less advances of $125.00 per month, $1500.00balance due you at end of year, $712.50.
"In determining the net profits the same would be confined to the grain farm operations and hogsand would be based as follows: Market value, on the farm, of all grain and hay, whether used on the farm for livestock or not, less the ordinary farm operating costs and expenses, including labor, taxes, seed, maintenance, gas, oil, repairs, machinery and equipment depreciation. * * *
"My only incentive, I have to proceed, if we can come to understanding and terms, is that weather and river conditions in the future years, as well as the economic and farm commodity price conditions may enable us to increase this average net income a few thousand dollars per year. That's a gamble we have to take."
Schmidt testified that upon one occasion, he asked Davis "about the contract I had, this letter, whether he shouldn't make up a more formal contract, and he said that contract was as good as it could be, as good as he could write one, and that was all I needed." On another occasion, Schmidt said, "again I pressed Mr. Davis to know whether it would not be advisable for him to write me a more formal contract, as I put it, * * *. He told me that contract was as good as it could be and I didn't need any other." Schmidt's wife testified she was present on the latter occasion and that Davis said, "you don't need anything more than that letter. That is as good a contract as I can write." Mrs. Schmidt also stated that Davis made a similar answer to Schmidt's inquiry in her presence upon still another occasion.
Davis admitted having conversations with Schmidt regarding compensation and discussing the contents of his letter with the Schmidts, but did not recall having made the statements testified to by the Schmidts. When his deposition was taken, Davis was asked if, prior to buying the farm, he wrote a letter setting up the provisions under which Schmidt was to work if Davis purchased the farm and, also, if the terms were set out in the letter. His answers were, "the letter speaks for itself." Again, in Davis' deposition: "Q. And then you want to say here that Ray Schmidt started to work for you or the Morival Farms, or for either of you, without any agreement whatsoever as to what he was to receive? A. I would say there was nothing at all about any agreement about compensation unless the matter can be referred back to that letter of August 29th."
As stated in its brief, the corporation "has never denied that it employed respondent as its manager for the farm year, * * * and does not now deny such employment, but such employment was upon the basis that appellant would compensate respondent at the reasonable value of his services." At the trial, Davis stated that neither he nor the corporation had ever denied that Schmidt was entitled to "some" compensation for his services. Davis admitted that, after the August 29 letter was written, he, neither individually nor for the corporation, made any agreement with Schmidt as to compensation. And there was no evidence whatsoever of any agreement upon terms other than those contained in the letter. We therefore approve the referee's finding that the agreement was that Schmidt was to be compensated in the manner set out in the letter.
There is no merit in defendant's contention that the letter was too indefinite and uncertain to constitute a contract. It was a clear proposal to Schmidt for his services and the terms are express and unambiguous.
Nor do we agree that the letter, considered either as a contract or as a proposal, is void for lack of mutuality. Mutuality of obligation is not necessary if there is consideration other than a promise. Schonwald v. F. Burkart Mfg. Co., 356 Mo. 435, 202 S.W.2d 7. It is not material that Schmidt did not formally accept the offer contained in the letter. By entering upon his duties and managing the farm until released by defendant, he performed the obligations he assumed by accepting the offer. *958 Such performance was consideration to defendant. See Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624.
The cases cited by defendant are inapplicable. In Jesse v. Rolaff, Mo.App., 74 S.W. 2d 890, there was no contract in the first instance, and the services were voluntary. In Barnes v. Bragg, Mo.App., 198 S.W. 73, involving a unilateral agreement, the offeree abandoned the contract after part performance. And in Solace v. T. J. Moss Tie Co., Mo.App., 142 S.W.2d 1079, where there was only part performance, it was held that a contract lacking mutuality of obligation was void only as to its unexecuted portions.
Defendant next contends that the corporation is not liable upon this contract because there is no evidence that the corporation "authorized, accepted, ratified or adopted said letter or any proposal as the basis of an express contract." In other words, defendant concedes that it, the corporation, employed Schmidt as its, the corporation's, manager but asserts that "such employment was upon the basis that appellant would compensate respondent at the reasonable value of his services." However, as hereinbefore pointed out, there was no evidence whatsoever of a contract upon terms other than those contained in the letter. Schmidt's employment by the corporation must have been upon those terms.
The corporation actually accepted Schmidt's services upon the basis of the August 29 letter. Davis was defendant's organizer, executive officer and sole owner. He testified that "at the time of the incorporation, it was mentioned that Ray Schmidt would be the manager but that was all that was mentioned at that time"; that before the incorporation and purchase he had talked to Schmidt about being manager if he bought the farm but that "there was never anything mentioned about terms and conditions of his employment after the land was purchased"; that after the incorporation he "put Schmidt in as manager"; and that he dealt with Schmidt under general authority from the corporation and as its president and chief executive officer. Schmidt was employed by the recently organized corporation and the employment contract, whatever its terms, was that of the corporation.
The letter was initially a proposal from Davis to Schmidt, and the corporation adopted that proposal and accepted the benefits resulting from Schmidt's performance thereof. 18 C.J.S., Corporations, § 122, p. 523; 13 Am.Jur., "Corporations," §§ 108, 109, pp. 249, 250; and Anno. 123 A.L. R. 726. And see Panich v. Curtis, Owen, Fuller Corp., Mo.App., 124 S.W.2d 619; and Neosho Motors Co. Inc., v. Smith, Mo.App., 59 S.W.2d 802. All of the cases cited by defendant restate and apply the rule that a corporation is liable where it has ratified or adopted a contract made prior to incorporation and has accepted the benefits thereof.
Nor is it material that the corporation's record did not show the terms of Schmidt's employment. The board minutes do not even show the employment itself. However, defendant does not deny that it, the corporation, employed Schmidt or that it, the corporation, did not have a contract with Schmidt. It denies only the terms of that contract. Having conceded the employment, having failed to negative the overwhelming, and only, evidence that the employment terms were those contained in the letter, having conceded that Schmidt did serve as manager, defendant cannot now successfully maintain that that contract was not binding upon defendant merely because either Schmidt's employment or the terms thereof were not entered in the minutes.
We rule adversely to defendant its assignment that Schmidt did not accept the letter's terms unconditionally but injected new terms and conditions. The record clearly shows that neither Schmidt, the corporation nor Davis, either as an individual or as the corporation's representative, ever attempted to qualify the terms of the letter until December, 1946, or January, 1947, which was before defendant notified Schmidt that his contract would not be renewed for the farm year beginning March 1, 1947.
The referee found that Schmidt had "performed his contract in a reasonable *959 manner." Defendant asserts that Schmidt, as a fiduciary, failed to sustain his burden of showing that his management was not fraudulent. Assuming that Schmidt was a fiduciary and that he had such burden, the record sustains the referee's findings that Schmidt properly performed his contract. And by specifically finding for Schmidt upon most of the other issues, the referee, in effect, found that Schmidt's conduct was not fraudulent and that he had not violated any obligations of such fiduciary relationship. This assignment is ruled against defendant.
The findings were against Schmidt upon his minor claims. He had failed to occupy one of several available residences. He could have purchased, out of corporation funds under his control, a cow for his own use. And use of his own car for the corporation's business was offset by his use of the corporation's trucks in his individual farm operations.
Defendant asserts that the net profits for the farm year were improperly determined, citing 50 C.J., "Profit or Profits," p. 645, and Morrow v. Missouri Pac. Ry. Co., 140 Mo.App. 200, 123 S.W. 1034. General definitions are of little aid where, as here, the contract itself provides what shall be considered profits.
Most of the income and inventory-expense items were either expressly agreed upon or not contested. Defendant claimed that the hog, feed, hay and straw inventory figures, which Schmidt totaled at $17,169.25, should have been $15,728.44. The referee's finding was $16,910.00$1259.25 less than Schmidt's claim and $1181.56 more than defendant's figure. Defendant offered no evidence as to the $2883.58 for preparing ground and seeding. However, the referee reduced this item to $2608.58. The evidence supports these findings.
The referee properly rejected evidence as to the rental value of 3 residences occupied by defendant's employees. This was not an expense under the contract. And he properly ruled that, in determining net profit, depreciation of the farm buildings, as such, was not an expense because the contract limited allowable depreciation to that upon machinery and equipment.
The referee allowed $400 for repairs and maintenance to buildings and private roads. Defendant contends that the allowance should have been $3227.50 for building repairs and $876 for road repairs, a total of $4103.50. The referee concluded that "in arriving at net profits of a farming operation, the ordinary maintenance of the farm buildings should be stated in the account as an item of expense. This does not mean the cost of extensive improvements to the buildings or to major remodeling jobs but only the ordinary maintenance that will keep the buildings in as good a state of repair as they were at the beginning of the employee's term of service. The same rule should apply to the maintenance of farm roads."
The cases and authorities cited by defendant, defining and distinguishing the terms "repairs," "improvements" and "remodeling" are inapplicable. Assuming without deciding that defendant's extensive and expensive work on the buildings and roads was "repair," it clearly was not the "ordinary" repair specified in the contract.
This farm is in the Missouri River flood basin. Like "the deep and dark river" between the Land of Beulah and the Celestial Gate, the Missouri "at times overflows its banks in some places," and "its ebbings and flowings" are anxiously noted and recorded. But those who farm the Missouri River flood plain know loss and destruction that Bunyan "wot not." As Job observed to Zophar, "the flood decayeth and drieth up." Buildings, not "made of gopher wood and pitched within and without with pitch," are generally swept from their foundations and left askew, sagging and rotting. Roads "are waste and none passeth by."
There was little conflict in the testimony either as to the condition of the buildings and roads when the farm was purchased or as to what work was done upon them by defendant during the 1946-1947 farm year. Most of the work was upon 3 residences and a large barn. The barn and 2 of the residences were in the Missouri River flood area and were flooded in the 1942, 1943 *960 and 1944 floods. The 7-room house had 1944 floodwater marks up to the first floor ceiling. Neither that house nor the 5-room house had been occupied since the 1944 flood. In both, the sills were rotten, the floors, steps, doors, windows, window sills and sashes were warped; the plaster was partly off; the weatherboarding was warped, loose or missing; and the roofs were in bad condition. The "big barn," according to Davis, was in "pretty bad condition"; boards had to be replaced on the sides and ends, the doors rehung and the roof repaired. "We probably did more work on this in the nature of repairs than any other building on the place." The 2-story, 8-room frame house "on the hill," outside the flood area, had missing weatherboards, falling plaster, a rotted sill, leaky roof, warped floors and bad doors and windows. Most of the other buildings involved, such as a small barn, a machine shed, a chicken house, cribs and bins, had been flooded.
The roads in the bottom had been flooded and were rutted, covered with silt and in very bad condition. According to Davis, they were "almost impassable * * * due to ordinary wear and tear for years, and also probably due somewhat to the flood, or the sediments that had formed in there, but not altogether." Defendant graded and graveled them at a cost of $876.
We do not agree that "ordinary maintenance" of a farm building or road means "restoration to its former better condition when in good repair," or that "restoring a building to its former better condition constitutes repairs." The contract provided that "ordinary farm operating costs and expenses including * * * maintenance and * * * repairs," were expenses for the purposes of the contract. It is obvious that the work defendant did upon the buildings and roads was not ordinary. It is not material whether such work be termed "maintenance," "repairs," "restoration," "reconstruction," "remodeling" or "improvement." It was not work usually and customarily done each year upon farm buildings and roadseven those on a bottom farm subject to occasional inundation by floodwaters.
The referee allowed only those costs incurred in maintaining or repairing buildings and roads in their March 1, 1946, condition. Such would have been "ordinary maintenance" or "ordinary repairs." But defendant did more than that. In defendant's own language, it "restored" the buildings and roads to their "former better condition when in good repair." The referee properly ruled this issue.
The reduction of defendant's claim for Davis' supervisory expenses from $400 to $50 is not justified by the record. Davis testified that he made many trips to the farm. Schmidt said that while Davis was not there often in the early part of 1946, "after he moved his law office to Washington, he was down there more often." In his brief Schmidt concedes: "The truth of the matter is that Davis was on the farm on numerous occasions and often enough to know exactly what was going on at all times." The record shows that $400 was the reasonable value of Davis' supervisory services and this amount should have been included as an expense of the farm's operation that farm year.
Turning to defendant's counterclaim, defendant had the accounting it asked for in Count 1 and, with one exception, the record sustains the referee's rulings, adverse to defendant, upon the other 3 counts. As to Count 2, he found that the prices at which Schmidt had sold the farm machinery were those agreed upon and were reasonable; and that there was a failure of proof as to OPA ceilings. (The OPA ceilings were shown to be the manufacturers' listed or suggested retail prices but there was no evidence of such prices.) As to Count 3, he found that the amount Schmidt charged defendant for preparing land and planting crops in the fall of 1945 (while Schmidt was still in possession as tenant and co-owner) was fair and reasonable. There was a total failure of proof that the charge for corn sold defendant was in excess of OPA prices. As to Count 4, the finding was that the hogs which Schmidt sold defendant above alleged OPA ceilings were not of the class or category to which OPA regulations applied. While the evidence *961 was conflicting, there is ample testimony in the record sustaining this finding.
However, the referee should have allowed defendant $350 of the $415 claimed in this Count 4. Just before Schmidt "took over," on March 1, 1946, he sold his hogs to defendant. The minutes of the July 17, 1946, meeting of defendant's board of directors, recite the agreement to purchase "at $14.85 per cwt. as soon as the weights and amounts could be determined by Ray which has not been done up to this time." The minutes of that meeting also "approved and ratified the actions of the officers in consummating the purchase of certain hogs from Ray Schmidt as of Feb. 15th, 1946." Schmidt was not present at the July 17, 1946, meeting. But he was present at the next meeting, January 29, 1947, when the minutes of the July 17 meeting were read and approved and he "declined to vote thereon because he had not attended the meeting and was not familiar with what took place." However, he heard the minutes of the previous meeting read and approved, and did not question the recital that the sale price was $14.85 per cwt. We deem such admission conclusive. Defendant is entitled to $350, the difference between $14.85 per cwt. and $16.50 per cwt. Schmidt charged and collected.
Interest from March 1, 1947, was properly allowed. Sec. 3226, Mo.R.S. 1939, and Mo.R.S.A. § 408.020, Mo.R.S. 1949; and Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814. Interest is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because he questions legal liability for all or portions of the claim. See 1 Sutherland, Damages, 4th Ed., Secs. 321, 329, pp. 1004, 1030. It is a reasonable inference that the first annual settlement under Schmidt's contract was to be made prior to the beginning of the next farm year, March 1, 1947. Having released Schmidt as of March 1, 1947, defendant was obligated to settle with and pay him not later than that date.
Defendant urges the amount due Schmidt was not definitely capable of ascertainment. However, at the trial, defendant contested only 3 of the 13 income items and only 3 of the 23 expense-depreciation items. Davis and Schmidt discussed all of the items in December, 1946, and January, 1947, for income tax returns purposes and defendant had the figures upon which to settle. Schmidt demanded an accounting and a settlement, but defendant refused and failed to settle. It should pay interest upon the amount ultimately determined was due Schmidt on March 1, 1947. See 1 Sedgwick, Damages, 9th Ed., Secs. 314a, 315, pp. 622, 624; and 1 Sutherland, Damages, 4th Ed., Secs. 329, 347, 348, pp. 1030, 1092, 1098.
It is not material that Schmidt made no demand for interest until suit was brought. He had demanded a then due settlement of defendant's obligation. In J. R. Watkins Co. v. Oldfield, Mo.App., 168 S.W. 2d 594, cited by defendant, the obligation of the guarantors of a buyer's contract to purchase goods for the debt of their principal did not arise until notified of the principal's default. See Limpus v. New York Life Ins. Co., Mo.App., 226 S.W.2d 97; and contrast Maryland Casualty Co. v. Spitcaufsky, 352 Mo. 547, 178 S.W.2d 368. And see 1 Sedgwick, Damages, 9th Ed., Sec. 314, p. 621.
It is our conclusion that Schmidt is entitled to judgment for $5784.57 ($5872.07, less $87.50, 25% of the $350 disallowed Davis' expense) on his petition and that defendant is entitled to a credit thereon of $350 (the amount paid Schmidt for his hogs over and above the agreed price). This result, $5434.57, should bear 6% interest from March 1, 1947.
The judgment is reversed and the cause is remanded with directions that the judgment be modified and corrected in accordance with the rulings herein.
VAN OSDOL, C., concurs.
COIL, C., not sitting.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.