LOVE 1979 PARTNERS, First Plaza Redevelopment Corporation, et al., Respondents,

v.

PUBLIC SERVICE COMMISSION OF MISSOURI, Appellant,

and

STATE ex rel. Gerald A. RIMMEL, etc., Relator-Respondent,

v.

PUBLIC SERVICE COMMISSION OF MISSOURI, Defendant-Respondent,

and

Union Electric Co., et al., Intervenors-Respondents Appellants.

No. 67404.

Supreme Court of Missouri, En Banc.

July 15, 1986.

Rehearing Denied Sept. 16, 1986.

Claiborne P. Handleman, St. Louis, W.R. England, III, Paul A. Boudreau, Thomas M. Byrne, Jefferson City, for appellant.

Robert G. Brady, Joseph Colagiovanni, Joanne Clark Kuhns, Thomas A. Schweich, St. Louis, Richard S. Brownlee, III, Jefferson City, for respondents.

BLACKMAR, Judge.

This case involves an ambitious program for using refuse from the City of St. Louis in the generation of commercial steam.

Because the program calls for the sale of some of the facilities of Union Electric Company (UE), a regulated electric company and heating company, the jurisdiction of the Missouri Public Service Commission was invoked.[1] The Commission, after an evidentiary hearing, granted the required approval. Certain steam users presently served by UE successfully challenged the Commission's order in the Circuit Court of Cole County, which set aside the order and remanded the case to the Commission for further proceedings. UE and the Commission appealed directly to this Court. We now reverse the decree of the circuit court and sustain the order of the Public Service Commission.

UE for many years had produced steam from oil-fired boilers at its Ashley plant, which it sold to customers in downtown St. Louis. Its rates were regulated by the Commission. The steam is distributed through a network of underground pipes known as the "steam loop." The steam operation has not produced an attractive return in recent years. There had been no rate increase since 1981. Some customers have switched to alternate heating methods, and UE has been interested in disposing of the operation.

Bi-State Development Agency (Bi-State) is a public agency established by interstate compact approved by the legislatures of Missouri and Illinois[2] and by the Congress of the United States[3] as required by Art. I, Sec. 10, of the Constitution. It is governed by a Board of Commissioners appointed in equal numbers by the governors of each state and renders a variety of services in the Greater St. Louis metropolitan area. It has no taxing power but does have the authority to issue revenue bonds to finance

---

1. The Commission can acquire jurisdiction over UE in two ways. First, as an electrical company UE is subject to § 393.190, RSMo Cum.Supp. 1984, which provides that an electrical company shall not sell "the whole or any part of its franchise, works or system, necessary or useful in the performance of its duties to the public ... without having first secured from the commission an order authorizing it so to do." Alternatively, the operation of a steam system qualifies UE as a heating company under § 386.020, RSMo Cum.Supp.1984. Section 393.290, RSMo 1978, makes applicable to heating companies the provisions of 393.190 relating to electrical companies with regard to proceedings before the commission.

2. Sections 70.370–70.440, RSMo 1949; Ill.Rev. Stat. Ch. 127, ¶¶ 63r–1—63r–4 (1949).

3. Bi-State Compact, Ch. 829, 64 Stat. 568 (1950).

its various projects and to accept contributions from agencies of government.[4]

For many years the City of St. Louis has had a problem in the disposal of refuse. It is under order from the Environmental Protection Agency to bring its present incineration operations to an end. Bi-State undertook an inquiry as to the feasibility of using the city's refuse in the production of steam to be distributed to the customers now served by UE's Ashley plant and steam loop. It made inquiries about available contractors and decided to negotiate with Thermal Resources of Ohio, Inc. which formed a wholly-owned subsidiary, Thermal Resources of St. Louis, Inc., (Thermal) for its prospective Missouri operations.

The program, set out in three interdependent contracts, called for (1) the sale of the steam loop by UE to Bi-State; (2) the sale of the Ashley Plant by UE to Thermal and its conversion of some oil-fired boilers to coal-firing; (3) the discontinuance of UE's steam distribution operation and its replacement by Bi-State as a supplier of steam to UE's customers; (4) the operation of the steam production and distribution facilities by Thermal in accordance with its contract with Bi-State (described as "Phase One"); (5) the temporary supply of electric power from the Ashley plant to UE until it could construct alternate facilities; and (6) the design and construction by Thermal of a refuse-to-steam plant (described as "Phase Two"). It is contemplated that the new plant will provide the normal quantities of steam required by the customers, but the Ashley plant will be retained for "peaking" supply and will be available during temporary shutdowns, as for repairs.

UE applied to the Public Service Commission for approval of the contracts for sale of the Ashley plant and the steam loop, and for authority to discontinue its operations as a regulated heating company. The Com-

mission directed UE to notify its steam customers, some 18 of which sought and were granted leave to intervene. A group of these intervenors, representing only a small minority of the steam users, actively opposed the application before the Commission.

The objecting users assert legal arguments against the proposal essentially as follows: [5]

1. Section 70.373(2), RSMo Cum.Supp. 1984, which purports to confer upon Bi-State the power to acquire and operate facilities for the conversion of waste and refuse into energy, was "invalid" at the time the Commission acted because it had not at that time been consented to by Congress;

2. Section 70.373(2) does not authorize Bi-State to acquire and operate oil-fired or coal-fired facilities for the production of steam;

3. The Commission was in error in yielding up its jurisdiction over Thermal as a "heating company."

The users also argue that the proposals should not be approved because there is no assurance that a refuse-to-steam facility would ever be built, and that the entire program is not in the public interest because it is not feasible and economic. They subsume these arguments in a claim that the decision is not supported by substantial evidence.

The Commission, without dissent, rejected the users' arguments and granted the permission sought. It found that the proposed contracts were a part of an integrated plan and that the initial acquisitions were a first step in the plan. It concluded that the overall plan was not detrimental to the public interest and that the contracting parties were capable of carrying it out. It rejected the users' argument that the plan would produce an unreasonable increase in

---

4. Section 70.370, Art. III (4) and (5), RSMo Cum.Supp.1984.

5. The respondents argue that any constitutional claims have been waived because they were not presented to the Public Service Commission. We believe that the essential bases of the challenge were clear at all stages of the proceeding, and therefore perceive no obstacle to the consideration of the merits.

rates for steam, and held that the fact of an initial rate increase was not ground for disapproving the plan. It concluded that Thermal was exempt from it jurisdiction because it served only Bi-State, which was specifically excluded by statute from Commission jurisdiction by § 386.020(10), RSMo Cum.Supp. 1984. It also found that the transaction was authorized by the governing statute.

Following denial of their application for rehearing, the users sought review in accordance with § 386.510, RSMo 1978, in the Circuit Court of Cole County, which set aside the decision of the Commission. The court found that the users had properly presented and preserved all the legal issues ruled on, and that these issues had merit. It made no ruling on the other issues assigned by the users, presumably because the legal findings were adequate to support its conclusions.

■■■ UE, the Commission, Bi-State and Thermal have appealed.[6] We have initial appellate jurisdiction because the users have drawn the validity of § 70.373(2) into question by pointing to the absence of congressional approval at the time the Commission acted.[7] Mo. Const. Art. V, Sec. 3. It is helpful, at the outset, to comment on the scope of our review. There is no presumption in favor of the Commission's resolution of legal issues. Nor is there any presumption in favor of the circuit court's determination of these issues, over and above an appellant's normal burden of demonstrating error. So we decide the legal points anew. The decision of the Commission on factual issues, however, is presumed to be correct until the contrary is shown and we are obliged to sustain the Commission's order if it is supported by substantial evidence on the record as a whole.[8] The circuit court did not reach the factual issues, and so had no occasion to consider the users' challenge to the Commission's factual findings, but the users are entitled to maintain their factual challenges as additional reasons for sustaining the judgment of the circuit court.

### 1. Legal issues.

#### a. The basic authority of Bi-State.

■■■ Art. I, Sec. 10, of the Constitution of the United States provides in pertinent part as follows:

No state shall, without the consent of Congress, ... enter into any agreement or compact with another state....

Section 70.373(2), was amended in 1980 to include language granting Bi-State the authority to operate refuse-to-energy facilities. An identical provision was adopted by the legislature of Illinois.[9] At the time the essential contracts were entered into, and at the time the Commission issued its order, Congress had not approved or consent-

---

6. The users have moved to strike the appeals of Bi-State and Thermal on the ground that they did not participate in the Commission proceedings and therefore are not proper appellants under § 386.540, RSMo 1978. Each applied for leave to intervene while the case was pending in the circuit court. The users initially objected to the intervention but then withdrew their objections. Under this state of the record the motion should be, and is, overruled. The appeals of the Commission and UE are adequate to carry the entire case to this Court. The presence of Bi-State and Thermal as parties is helpful in binding them to the obligatory portions of the Commission's order. We need not decide what the situation would be if an intervenor who had not participated in Commission proceedings were the only party who sought to appeal.

7. In the Findings of Fact, Conclusions of Law, Order, and Judgment, Judge Kinder states that

"[b]ecause congressional consent was never obtained for the 1980 amendment to the Bi-State Compact ... under which Bi-State seeks to acquire Union Electric's steam facility, said amendment is *invalid*." (Emphasis supplied).

8. *State ex rel. Utility Consumers Council of Missouri, Inc. v. Public Serv. Comm'n*, 585 S.W.2d 41, 47 (Mo. banc 1979); *State ex rel. Ashcroft v. Public Serv. Comm'n*, 674 S.W.2d 660, 662 (Mo. App.1984); *State ex rel. Inman Freight System, Inc. v. Public Serv. Comm'n*, 600 S.W.2d 650, 654 (Mo.App.1980). Section 386.510, RSMo 1978, calls for an inquiry by the court into the "reasonableness and lawfulness" of the Commission's order. The cited cases demonstrate that standard for review is essentially the same as cases decided by other administrative tribunals.

9. Section 70.373(2), RSMo Cum.Supp.1984; Ill. Rev.Stat. Ch. 127, ¶ 63s–9 (1986).

ed to these amendments. That approval did not come until the adoption of SJR 127 on September 23, 1985. The users argue that the Commission's order is unauthorized by law because, at the time it was entered, § 70.373(2) was invalid for want of congressional consent.

We do not agree. We need not speculate as to what the situation would have been if congressional consent had not been forthcoming, or if one of the parties relying on the statutory section had changed its mind prior to the approval by Congress. We do not even need to consider the appellant's arguments: (1) that the contracts in issue affect only the state of Missouri and so do not depend on congressional approval, citing *Virginia v. Tennessee,* 148 U.S. 503, 13 S.Ct. 728, 37 L.Ed. 537 (1893) and *United States Steel Corp. v. Multistate Tax Commission,* 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978), and, (2) that Congress had given advance consent to interstate compacts relating to the conversion of refuse into energy, citing *Cuyler v. Adams,* 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). We hold that the subsequent congressional approval was effective to remove any existing infirmities and that § 70.373(2), in its present form, governs the transaction.

Ratification is familiar doctrine in various areas of the law.[10] The purpose of the compact portion of Art. I, Sec. 10, is to permit Congress to protect the sovereignty of the United States against dilution by concerted action among the states. It is clear from the Joint Resolution that Congress is now willing to see this transaction consummated. The parties initially concerned—UE, Bi-State, Thermal, and the Public Service Commission, are now before the Court urging affirmance of the Commission's decision and reversal of the circuit court. The first three effectively bind themselves anew to the contracts and would be estopped to repudiate them. The users' interest in congressional approval is minimal. The Missouri legislature has given its approval, as has the Public Service Commission. If the Commission's order is otherwise sustainable, Art. I, Sec. 10, interposes no bar.

Our conclusion is consistent with *Bank of Washington v. McAuliffe,* 676 S.W.2d 483 (Mo. banc 1984), which held that questions about whether "straw parties" acting on behalf of a bank holding company could act as incorporators of a new bank were no longer viable when the legislature, following incorporation, gave express authorization for them so to act.

The users, as a subsidiary argument, assert that the consent of Congress could not be effective prior to September 23, 1985, and that they should be entitled to refunds of the monies, representing the difference between old and new rates, which the circuit court ordered paid into its registry pending appeal. We do not agree. Ratification gives retroactive vitality to the acts ratified.[11] Retroactivity is especially appropriate here, because the joint resolution held expressly that the newly approved powers were to be effective as of January 1, 1983, which is before the applicable contracts were executed and before the date of the Commission's order. Congress has the authority to decide whether the additional powers of Bi-State are consistent with the national interest. It was aware of the specific transaction now before us. The users had no right to the maintenance of the existing rate structure. There was strong likelihood that the rates would have been increased even if UE had remained the owner of the steam facilities. The users have not shown that they are entitled to a refund of any part of the impounded funds.

The users raise the spectre of retroactive legislation. The only retroactivity is that

---

10. *See* Restatement (Second) of Agency § 82 (1958); *Schmidt v. Morival Farms, Inc.,* 240 S.W.2d 952 (Mo.1951) (corporate law); *Corder v. Morgan Roofing Co.,* 355 Mo. 127, 195 S.W.2d 441, 446 (1946) (insurance law); 75 C.J.S. *Ratification,* and *Ratify* (1952).

11. Restatement (Second) of Agency § 82, comment c, at 210–211 (1958); *Wilks v. Stone,* 339 S.W.2d 590, 595 (Mo.App.1960); *Ireland v. Shukert,* 238 Mo.App. 78, 177 S.W.2d 10, 14 (1944).

of Congressional approval, and this does not deprive them of any vested right. The appropriate Missouri authorities, legislative and administrative, have given their effective approval. No supervening rights of the users have been violated.

### b. The authority of Bi-State to operate the present steam facilities.

 Section 70.373(2) with significant provisions underscored, reads as follows:

> To acquire by gift, purchase or lease; to plan, construct, operate, maintain, or lease to or contract with others for operation and maintenance; or lease, sell or otherwise dispose of to any person, firm or corporation, subject to such mortgage, pledge or other security arrangements that the bi-state development agency may require, facilities for the receiving, transferring, sorting, processing, treatment, storage, recovery and disposal of refuse or waste, and facilities for the production, conversion, recovery, storage, use or use and sale of refuse or waste derived resources, fuel or energy and industrial parks adjacent to and necessary and convenient thereto;

The users observe that Bi-State is not now equipped to produce steam from refuse and that it proposes to operate the present facilities for the foreseeable future, generating steam from an oil-fired or coal-fired generating plant. They argue that, whatever the authority to operate a refuse-to-steam facility might be, Bi-State has no express or implied authority to operate the present facilities.

The Commission found that the contracts for which Commission approval was sought envision a comprehensive plan, looking to the construction of the refuse-fired facilities. Acquisition and operation of the steam loop and the Ashley plant are necessary initial steps pending construction of the refuse-treatment plant. The evidence shows that it would not be practicable to build the new plant first and then search for steam customers. There is also support for the assertion that quick action is necessary to avoid obsolescence of the steam loop and further loss of customers. The Commission's conclusions as to practicability and necessity are essentially factual findings, which we find to be supported by the record.

Given the factual findings as just described, we conclude that Bi-State has the authority to acquire the steam loop and to furnish steam to customers, as an implied power necessary to the exercise of the express powers conferred by § 70.373(2). Bi-State also has the implied power to continue the use of the Ashley plant as a peaking or auxiliary facility, following the construction of the new plant. The power to build and to operate the refuse-treatment plant connotes the power to do what is necessary to make the program practical and economic. The legislatures and Congress surely did not intend to confer power, only to see it frustrated by a grudging construction of the governing authority.

The users argue that the powers of public agencies should be strictly construed. Much authority supports this abstract proposition, but more recent cases accord a degree of flexibility, looking to the broad purpose rather than dwelling on minute details. *Cape Motor Lodge, Inc. v. City of Cape Girardeau,* 706 S.W.2d 208 (Mo. banc 1986). A public body should not be allowed to extend its powers, but should be allowed substantial discretion in the exercise of its conferred powers.

 The users observe, however, that there is no obligation on Thermal to complete the construction of the refuse-consuming plant, and no guarantee that that plant will ever be built. They construct a scenario in which Thermal abandons the project and Bi-State is unable to find another contractor. Under this scenario Bi-State might continue to operate the steam loop with steam produced by the Ashley plant, for the foreseeable future.

The bare possibility that events might unfold in this manner furnishes no reason for rejecting the proposal at its inception. Bi-State is a public body, subject to control of the public authorities. There is no indi-

cation that it is not proceeding in the best of faith in the sincere desire to consummate a refuse-to-energy project. It has the authority to oust Thermal, to acquire the Ashley plant itself, and to employ another contractor, if Thermal does not proceed with dispatch and perform to its satisfaction. The basic plan looks many years into the future. A present contract which covers all details of the program might not be the contract most conducive to the public interest, for present obligation might have a high price. The proposed program is not rendered invalid simply because the precise timing is uncertain and risks are involved.

Both parties cite *Reilly v. Sugar Creek Township of Harrison County*, 345 Mo. 1248, 139 S.W.2d 525 (1940), which holds that a township having the power to build roads has the implied power to acquire rights of way, by reimbursing other public authorities for condemnation damages paid in acquisition. The case is more helpful to the appellants than to the users. There is no suggestion that the township had to have all road construction contracts in place before it proceeded with the acquisition of rights-of-way. Public bodies, indeed, may engage in extensive planning expense and acquisition costs without binding themselves to complete the improvements, and have the authority to abandon projects for which authority has been granted and bonds voted. It is safe to say that few public involvements would be completed if all contracts had to be in effect before the first spade was turned.

### c. PSC jurisdiction over Thermal.

■ The users claim error in the Public Service Commission's yielding up its authority over steam from the Ashley plant by permitting UE to sell the plant to Thermal, and by concluding that Thermal is not a "heating company" subject to its jurisdiction.

Under the contract arrangement, however, Thermal will supply steam only under contract with Bi-State, which is exempt from regulation.[12] The Commission prop-

erly concluded that Thermal is involved in the transaction only as the instrumentality chosen by Bi-State to carry out its powers. Bi-State, rather than Thermal, has the ultimate responsibility for serving the customer. The rates are established by contracts between Bi-State and Thermal. Bi-State's exemption insulates Thermal from regulation by the Commission. Thermal does not hold itself out as available to, and is not bound to, serve the public. *Cf. State ex rel. M.O. Danciger & Co. v. Public Service Commission*, 275 Mo. 483, 205 S.W. 36 (1918); *State ex rel. Lohman & Farmers' Mut. Telephone Co. v. Brown*, 323 Mo. 818, 19 S.W.2d 1048 (1929).

■ The users have no statutory right to steam service from a utility subject to Commission regulation. The legislature, in it wisdom, has given the Commission jurisdiction only over investor-owned utilities, and has specifically exempted public agencies of Bi-State's type. The fear, apparently, was that profit-making utilities might make use of their naturally monopolistic situation to extract exorbitant profits for their owners. The Commission does not regulate rates of municipally-owned utilities and rural cooperative associations. *See Pace v. City of Hannibal*, 680 S.W.2d 944 (Mo. banc 1984). Public agencies have no motive for seeking profits and political pressures arguably exert downward pressure on rates. Whether or not we agree with the legislature's concept of the public interest, as evidenced by its regulatory program, is beside the point.

### 2. Factual Arguments.

■ The users argue, finally, that the Commission's decision is "not supported by competent and substantial evidence."

It is initially suggested that the Commission applied the wrong standard of review. The users insist that the applicants have the burden of showing that the sale of the utilities' assets is in the public interest and that the proposed purchaser of the assets

12. *See* 386.020(10), RSMo Cum.Supp.1984.

is capable of assuming the utility's role in providing service.

The Commission's decision and order shows that concern for the public interest was predominant in its deliberations. It considered not only the interest of its customers, but the interest of the St. Louis metropolitan area in solving its refuse problems. The thought of using refuse to produce worthwhile energy is certainly appealing. The Commission is justified in looking at the broad picture.

The users say that the Commission inadequately analyzed the financial capability of Thermal Resources of St. Louis, Inc., which is a corporation newly formed for the specific project at hand. Thermal Resources of Ohio, the parent corporation, however has guaranteed performance by its subsidiary. The question whether the Thermal complex has the technical capacity to carry through on the project is preeminently the kind of question which ought to be directed to the Commission.

The final suggestion is that the governing contracts will subject steam customers to unreasonable rate increases. As we have said earlier, the customers are not entitled to a guarantee of the status quo in the furnishing of steam. The Commission could conclude that the present facilities are obsolescent and uneconomic, and that rate increases would be anticipated even if UE were to continue the operation. It is also possible that UE would seek to discontinue the furnishing of steam, without the prospect of a successor, if it continued to lose customers. The contract documents provide for initial price increases, but with future increases to be controlled by a formula. The users complain of a "ratchet" effect, in which the new rates may go up but not down. The Commission might well conclude, however, that the new level had to be guaranteed in order to provide a stable project, and that the over-all plan provides the most reliable method for assuring a continued, reliable and economical supply of steam.

This case is very different from one in which we review a civil judgment for damages, to make sure that each element is supported by substantial evidence. The problems presented to the Commission involve subjective evaluations of economic factors. There is no sure method for predicting whether a project will succeed. Questions of analysis and judgment are committed by law to the decision of the Commission, which has the assistance of a technically trained staff and is better equipped to make decisions of this kind than we are. The users are asking us to substitute our judgment for its judgment. We decline to do this because we are persuaded that the Commission's decision is a permissible one under the record. There are times when the courts must step in to protect the public against arbitrary or unauthorized administrative action, but the users do not persuade us that such intervention is necessary or proper in this case.

The judgment of the circuit court is reversed and the case is remanded with directions to sustain the order of the Commission.

HIGGINS, C.J., and BILLINGS, DONNELLY, ROBERTSON and RENDLEN, JJ., concur.

WELLIVER, J., dissents in separate opinion filed.

WELLIVER, Judge, dissenting.

I respectfully dissent.

If our Public Service Commission is powerless to control the sale of assets of regulated utilities, it is in fact virtually powerless to regulate utilities in this era of sales and mergers. Our holding today is an open invitation for manipulated sales and mergers. I would affirm the circuit court.