BARKET, LEVY & FINE, INC., Appellant,

v.

ST. LOUIS THERMAL ENERGY CORPORATION;   Bi–State Development Agency of the Missouri–Illinois Metropolitan District, Appellees.

No. 93–2227.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1993.

Decided April 7, 1994.

Mark D. Hirschfeld, St. Louis, MO, for appellant.

Daniel G. Vogel, St. Louis, MO (Thomas M. Newmark, on the brief), for appellee.

Before MAGILL and BEAM, Circuit Judges, and VAN SICKLE,* Senior District Judge.

MAGILL, Circuit Judge.

Plaintiff Barket, Levy & Fine, Inc., (BLF) appeals the district court's[1] judgment granting summary judgment to defendants St. Louis Thermal Energy Corporation (Thermal) and Bi–State Development Agency (Bi–State) in this 42 U.S.C. § 1983 action. BLF claims that the district court erred in concluding that Bi–State and Thermal's establishment and application of a steam heat rate system that distinguished between customers who had gas-fired boilers and those who did not complied with the Equal Protection

---

* THE HONORABLE BRUCE M. VAN SICKLE, Senior United States District Judge for the District of North Dakota, sitting by designation.

1. The Honorable Edward L. Filippine, Chief Judge, United States District Court for the Eastern District of Missouri.

Clause of the Fourteenth Amendment. Bi–State and Thermal assert that they are entitled to attorney's fees under 42 U.S.C. § 1988. We affirm the district court's grant of summary judgment and hold that Bi–State and Thermal are not entitled to attorney's fees.

## I. BACKGROUND

Bi–State is an interstate agency that coordinates regional planning and development in several contiguous counties in Missouri and Illinois. Both states authorized Bi–State "to develop facilities for the conversion of refuse to energy in the St. Louis area." *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.,* 948 F.2d 1084, 1086 (8th Cir. 1991) (*Thermal I*). Under this authority, Bi–State acquired the St. Louis steam distribution system (steam loop) from the Union Electric Company in 1984. At the time, the steam loop was losing customers and Union Electric was earning a poor return. Bi–State hired Thermal, a private corporation, to operate the steam loop.

In 1986, Bi–State created the dual rate system that is at issue here. Under this system, Bi–State charged a standard rate to customers whose buildings lacked a gas-fired boiler capable of generating the "total steam needs" of the buildings throughout the term of the service agreement. Supp.App. at 55 (quoting Interruptible Steam Service Agreement). Customers whose buildings had such boilers, however, were charged an "interruptible rate," which was lower than the standard rate. The interruptible rate service agreements contained a provision allowing Bi–State to terminate steam heat for any reason on ten days' notice. Standard rate customers were not subject to the possibility of such a service interruption.

BLF owned a commercial building (the Ambassador) in downtown St. Louis that purchased steam from Bi–State. Because the building was not equipped with a proper boiler, BLF was subject to the standard rate. In 1988, BLF brought this suit against Bi–State and Thermal, alleging that the dual rate system violated equal protection on its face and as applied and that the system violated anti-trust laws. BLF sought class certification, equitable relief, and damages. The district court granted summary judgment to defendants on the anti-trust claim. It also dismissed BLF's § 1983 equal protection claim, finding that Bi–State, and Thermal as its agent, were entitled to Eleventh Amendment immunity.

On appeal, however, we reversed the district court on the immunity issue and held that Bi–State and Thermal were subject to suit under § 1983 because Bi–State is not an arm of the states of Missouri and Illinois. *Thermal I,* 948 F.2d at 1088. Bi–State, we found, is properly characterized as a local government entity for purposes of § 1983 liability. *See id.* On remand, the district court denied class certification and dismissed BLF's claim for equitable relief as moot because BLF had sold the Ambassador. As to BLF's claim for damages, the district court granted summary judgment to defendants.

Applying the rational basis test, the court found that the steam loop rate system's distinction between customers with gas-fired boilers and those without was rationally related to a legitimate governmental purpose. It also concluded that BLF had failed to raise a genuine issue of material fact as to whether Bi–State and Thermal arbitrarily applied the rate system in practice. BLF appeals, asserting that the district court erred in granting summary judgment to defendants on BLF's equal protection claim. Bi–State and Thermal request attorney's fees on the ground that BLF's claim is frivolous.

## II. DISCUSSION

BLF claims that it was denied equal protection of the laws because Bi–State charged the class of customers of which BLF was a member a higher rate for steam heat than it charged another class of customers. It argues that, even under the highly deferential rational basis test, Bi–State did not have a constitutionally sufficient reason for treating the two classes of customers differently. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

## A. Equal Protection Claim

■ The parties agree that Bi–State's rate system does not interfere with a fundamental right or discriminate against a suspect class. Thus, we apply the lowest level of equal protection scrutiny, the "rational basis" or "rational relationship" test. Under this test, we will uphold a governmental policy or law if it "bears a rational relation to a legitimate government objective." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 461–62, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399 (1988). Indeed, "in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). A classification like that in the steam loop rate system " 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.' " *Kadrmas*, 487 U.S. at 462, 108 S.Ct. at 2490 (quoting *Hodel v. Indiana*, 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981)).

Moreover, "we are not bound by explanations of the [policy's] rationality that may be offered by litigants or other courts." *Id.* 487 U.S. at 463, 108 S.Ct. at 2490. Rather, BLF must " 'negative *every conceivable basis* which might support' " the classification at issue. *FCC v. Beach Communications, Inc.*, — U.S. ——, ——, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973) (internal quotation marks omitted)) (emphasis added). BLF has not satisfied its heavy burden.

■ We first ask whether at least one of the purposes of the classification involved a legitimate governmental interest. Charles Fishman, a vice-president and general manager of Thermal, stated that Thermal developed the classification "to promote an increased use of the downtown steam loop and thereby foster its viability as the basis for the long-term development of a refuse-to-energy project for the generation of steam." J.A. at 45. In *Love 1979 Partners v. Public Serv. Comm'n of Mo.*, 715 S.W.2d 482, 488–89 (Mo.1986) (en banc), the Missouri Su-preme Court held that Bi–State was authorized to acquire and operate the steam loop for purposes of eventually developing a system that would convert refuse to energy. Thus, preserving the economic viability of the steam loop for future development of a refuse-to-energy plan is a legitimate governmental purpose.

BLF argues, however, that the refuse-to-energy plan is not feasible and will never be developed. Because the plan is not feasible and Bi–State only has authority to operate the steam loop in anticipation of the plan, it asserts, preserving the economic viability of the steam loop is not a legitimate governmental interest. BLF bases its argument on the affidavit of Michael Cordes, a former Thermal employee who was involved in studying the refuse-to-energy plan. Cordes stated that "[b]ased upon" comprehensive studies completed in 1985, "the refuse-to-energy plan is not feasible and will never be built." J.A. at 156.

■ Cordes' affidavit does not create a genuine issue of material fact. Under rational basis review, we accept "at face value contemporaneous declarations of the [governmental] purposes, or in the absence thereof, rationales constructed after the fact, unless 'an examination of the circumstances forces [us] to conclude that they could not have been a goal of the [classification].' " *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 237 (3d Cir.1987) (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n. 7, 101 S.Ct. 715, 723 n. 7, 66 L.Ed.2d 659 (1981) (internal citation omitted)) (footnote omitted). Whatever the long-term prospects for the refuse-to-energy plan, we cannot say that preserving the steam loop for the plan "could not have been a goal of" the dual rate system. That studies completed in 1985 suggested that the plan was not feasible does not mean that the plan is an impossibility or that the underlying assumptions of the studies—such as the "abundant availability of landfill capacity in the greater St. Louis area"—will not change. J.A. at 156. As the *Love 1979 Partners* court found in 1986, the refuse-to-energy plan "looks many years into the future." 715 S.W.2d at 489. Indeed, Bi–State continues to operate the steam loop to

the present day, suggesting that the State of Missouri believes that Bi–State's operation of the steam loop is not ultra vires and thus that the refuse-to-energy plan remains a possibility.

■ That Bi–State and Thermal had access to the studies might shed light on their motives in developing the classification between customers with boilers and those without them. Under rational basis review, however, we will not "inquire into the subjective motives of the decisionmakers." *Schaeffer*, 811 F.2d at 237. Indeed, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the [government]." *Beach Communications*, —— U.S. at ——, 113 S.Ct. at 2102. Thus, the existence of the 1985 studies, and Bi–State and Thermal's awareness of them, does not create a genuine issue of material fact as to whether preserving the steam loop for the refuse-to-energy plan *could have been* a purpose of the classification. *See Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir.) (holding that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial"), *cert. denied*, —— U.S. ——, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993). Nor does Cordes' conclusory allegation that the plan "will never be built" overcome defendants' motion for summary judgment. *See Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed.Cir.1990). In essence, Cordes' affidavit is an attack on the wisdom of the continued operation of the steam loop. Whether or not the refuse-to-energy plan will ever be developed, however, the desire to preserve the economic viability of the steam loop for future integration with the plan could have been one purpose of the classification at issue because the plan is a long-term project that remains a possibility, albeit a remote one according to BLF.

■ The next question is whether the classification is rationally related to this purpose. When Bi–State acquired the steam loop in 1984, the loop's prospects for survival were bleak because it was losing customers and earning a poor rate of return. Among Bi–State's potential customers were those with gas-fired boilers who could heat their buildings without using the steam loop. Offering the lower interruptible rate to such customers tends to encourage them to stop using gas and switch to steam heat. Thus, Bi–State reasonably could have believed that the interruptible rate would enable the steam loop to attract new customers and become an economically viable enterprise. *Cf. Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 681 (8th Cir.1989) (upholding classification designed to help school district attract quality teachers and administrators); *United Wire, Health & Welfare Fund v. Morristown Memorial Hosp.*, 793 F.Supp. 524, 539 (D.N.J. 1992) (upholding classification designed "to ensure the economic solvency of [state] hospitals"), *aff'd in part, rev'd in part on other grounds*, 995 F.2d 1179 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 382, 126 L.Ed.2d 332 (1993). This in turn would help ensure that the steam loop survive and be available for future use as part of the refuse-to-energy plan. Thus, the distinction between customers with on-premises boilers and those without is rationally related to the legitimate governmental purpose of preserving the steam loop.

■ BLF claims that the classification at issue is unconstitutional because the lower rate for interruptible rate customers is unrelated to the actual cost or nature of the service. Providing steam heat to standard rate customers, BLF argues, costs no more than providing it to interruptible rate customers. This observation is immaterial here. We agree with the district court that equal protection does not guarantee economic equality. The government may base rates on factors having nothing to do with the cost of providing a service where the distinction between those paying different rates is rationally related to a legitimate governmental interest, assuming the classification does not impinge on a fundamental right or involve a suspect class. *See, e.g., Swin Resource Sys., Inc. v. Lycoming County*, 883 F.2d 245, 256 (3d Cir.1989) (upholding county's practice of charging landfill users a higher rate for disposal of garbage originating outside of locality), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). Here, offer-

ing a lower rate to customers who would not otherwise be steam heat customers was rationally related to the legitimate goal of ensuring the economic viability of the steam loop.

■ Besides helping ensure the survival of the steam loop, the classification was also rationally related to another legitimate governmental purpose: promoting the loop's efficiency. Customers who have on-premises boilers have the ability to provide their own heat without using the steam loop. For this reason, the interruptible rate service agreements, unlike the standard rate agreements, contained a provision granting Bi–State the right to terminate steam service for any reason on ten days' notice. This provision allowed Bi–State to continue to attract new customers while retaining the ability to ration steam in the event of a shortage; during periods where steam usage is extremely high, for example, Bi–State can satisfy the needs of standard rate customers by terminating service to interruptible rate customers. We need not speculate, as BLF would have us do, about whether there will ever be such a shortage of steam heat. The salient point is that Bi–State could have believed that offering a lower rate to customers with boilers in exchange for the right to interrupt service at will would encourage supply to meet demand while at the same time ensuring necessary flexibility in the system. Thus, interruptible rate customers received a lower rate for two good reasons: they would not have become Bi–State's customers otherwise at a time when the steam loop needed new customers to survive and, unlike the standard rate customers, they could tolerate service interruptions in the event of an emergency. For this reason, the classification is immunized from BLF's equal protection challenge.

BLF's final claim is that Bi–State and Thermal arbitrarily applied the interruptible rate. It argues that Thermal amended the interruptible rate service agreements of "certain customers" by eliminating the provision granting Bi–State and Thermal authority to terminate service on ten days' notice. Appellant's Br. at 15. Under the amended agreements, these customers retained the immedi-

ate right to become standard rate customers in the event of a steam shortage, eliminating the possibility of a service disruption. The only customers who BLF claims received such favorable treatment, however, were interruptible rate customers in the first place. If BLF is arguing that it was treated differently to the extent Thermal did not offer it an amended interruptible rate agreement, we reject such a claim because BLF did not qualify for the interruptible rate and thus is not similarly situated to those customers who negotiated amended agreements. *See E & T Realty v. Strickland,* 830 F.2d 1107, 1109 (11th Cir.1987) (explaining that "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause"), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988).

Alternatively, BLF could be arguing that the amended agreements undermine the efficiency rationale behind the dual rate system. As to customers with amended interruptible rate service agreements, Bi–State cannot terminate their service selectively in the event the steam loop is overextended because they may elect to become standard rate customers and continue service. Thus, BLF asserts, these customers did not receive a lower rate in exchange for Bi–State's right to interrupt service at will; rather, they impermissibly received a lower rate than standard rate customers whose service contracts were functionally identical.

■ We have already explained, however, that the Constitution does not prohibit the government from charging different rates for the same service if there is a rational basis for doing so. Even absent the contract provision allowing service interruption at the discretion of Bi–State, a rational basis existed for offering the lower rate to these customers: the need to attract new customers and preserve the steam loop. If anyone has a right to complain about the amended agreements, it is the similarly situated interruptible rate customers who are still subject to service termination on ten days' notice. That several interruptible rate customers had contracts eliminating the risk of service interruption, however, does not render Bi–State's application of the dual rate system

arbitrary or irrational as to BLF. *Cf. Mahone v. Addicks Util. Dist. of Harris County*, 836 F.2d 921, 932–33 (5th Cir.1988) (applying rationality test to claim that government selectively imposed additional requirements on some applicants seeking land annexation).

At bottom, BLF's claim is that it had a right to the same rate for steam heat as customers with gas-fired boilers. The Constitution accords it no such right. Under rational basis review, the government has wide latitude to distinguish between different groups to further legitimate interests. Here, Bi–State and Thermal could have believed that distinguishing between steam customers who had gas-fired boilers and those who did not would allow the steam loop to survive for the refuse-to-energy plan and to function efficiently. Whether or not these objectives actually motivated defendants to develop the dual rate system, we cannot say that the classification was irrational on its face or that Bi–State and Thermal applied it arbitrarily as to BLF. Thus, we hold that defendants are entitled to summary judgment on BLF's equal protection claim.

### B. Attorney's Fees

Bi–State and Thermal claim that they are entitled to attorney's fees under 42 U.S.C. § 1988. Under § 1988, "the court, in its discretion, may allow the prevailing party [in a § 1983 action], other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). To the extent defendants request attorney's fees for services performed in connection with the proceedings in district court, we reject such a claim. They cite no authority for the proposition that the court of appeals may in the first instance award attorney's fees for legal services performed in district court.

We may, however, award attorney's fees to the prevailing party on appeal for legal services performed in connection with the appeal. *See Reel v. Arkansas Dep't of Correction*, 672 F.2d 693, 699 (8th Cir. 1982). A prevailing defendant-appellee is entitled to attorney's fees "only if the plaintiff's appeal is frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *Munson v. Friske*, 754 F.2d 683, 698 n. 10 (7th Cir.1985). Although BLF did not have a strong claim, we cannot say that its appeal was frivolous, unreasonable or without foundation. BLF had plausible, though unavailing, legal arguments. This is not "one of the few cases where defendant-appellees [are] entitled to attorney['s] fees for appellate work." *Id.*

### III. CONCLUSION

We affirm the district court's order granting summary judgment to Bi–State and Thermal and deny defendants' request for attorney's fees under § 1988.